
**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| SURESHBHAI PATEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No.: 5:15-CV-0253-VEH |
| | ) |
| CITY OF MADISON, ALABAMA, | ) |
| and ERIC SLOAN PARKER, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This case comes before the Court on Defendant City of Madison's and

Defendant Eric Parker's (collectively "Defendants") Joint Motions To Exclude

Opinion Testimony. Defendants have moved to exclude the testimony of the

following experts:

- Dr. Jeremy R. Cummings ("Dr. Cummings"), the "Cummings

  Motion" (Doc. 95);

- Jerry Wiley ("Wiley"), the "Wiley Motion." (Doc. 111).

## II.   PROCEDURAL HISTORY AND RELEVANT BACKGROUND[1]

Plaintiff Sureshbhai Patel ("Patel") initiated this lawsuit against the City of Madison and Parker on February 12, 2015. (Doc. 1). The incident giving rise to this lawsuit is alleged to have taken place on February 6, 2015. (Doc. 2 at 1). Patel claims that he was merely taking a morning walk in his son's neighborhood when Officer Parker, a police officer employed by the City of Madison, illegally stopped him. (*Id.* 1-3). Patel claims that the "stop was without reasonable suspicion or probable cause." (*Id.* at 3). During the course of the stop, Parker searched Patel for weapons. (*Id.*). None were found, but Patel claims that "[Parker] restrained [his] arms and slammed [him] face first into the ground." (*Id.*). It is this use of force that Patel claims was "unnecessary and excessive." (*Id.*). Patel says he suffered significant injuries from this event, including partial paralyzation. (*Id.*).

Patel has asserted the following claims: illegal seizure under 42 U.S.C. § 1983, unlawful search under 42 U.S.C. § 1983, excessive force under 42 U.S.C. § 1983, illegal search/assault under state law, false arrest/false imprisonment under state law, and assault and battery/excessive force under state law. (*Id.* at 4-7).

As a part of his case, Patel wishes to use two retained experts, Dr. Cummings

---

[1]  This relevant background is given to put the case in context, but the Court is not establishing any facts.

and Wiley. (Doc. 118); (Doc. 123-1).

## III.  STANDARD FOR THE ADMISSIBILITY OF EXPERT TESTIMONY

### A.  <u>General Requirements - Judge as Gatekeeper</u>

Regarding expert testimony, the Federal Rules of Evidence provide that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702 (2011). Rule 702 must be read in conjunction with three seminal decisions by the Supreme Court related to expert testimony: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

All rulings on *Daubert* motions are reviewed under an abuse of discretion

standard. *See, e.g., Joiner*, 522 U.S. at 141, 118 S. Ct. at 517 ("All evidentiary decisions are reviewed under an abuse-of-discretion standard."). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 F. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir.2005)).

In *Daubert*, the Supreme Court established that district judges act as "gatekeepers" for expert testimony. 509 U.S. at 592–93, 113 S. Ct. at 2796. The district court judge must assess the proffered testimony and make a preliminary determination about the scientific validity of the expert's reasoning and methodology. *Id.*

> As another district court in this Circuit has stated,
>
> Federal Rule of Evidence 702, read together with the trilogy of Supreme Court opinions that led to the Rule's revision in 2011, compels the district courts to perform a "gatekeeping" function when determining the admissibility of expert scientific and technical evidence. *See, e.g.*, *United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (internal quotation omitted).

*Broussard-Wadkins v. Maples*, 895 F. Supp. 2d 1159, 1165 (N.D. Ala. 2012), *aff'd*

*sub nom. Broussard v. Maples*, 535 F. App'x 825 (11th Cir. 2013).

The burden under Rule 702 rests squarely with the proponent of the expert witness:

> The proponent of the expert testimony carries a substantial burden under Rule 702. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999) (citing *Daubert*, 509 U.S. at 592 n. 10, 113 S. Ct. 2786). Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact. *See, e.g., Frazier*, 387 F.3d at 1260 ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ."); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002); *Maiz*, 253 F.3d at 664.

*See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).

## B. <u>The Eleventh Circuit Test for Admissibility</u>

The Eleventh Circuit has established a three-part inquiry for district courts to follow in performing their gatekeeper role. For evidence to be admissible under Rule 702, the district court must find that:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;

> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in

*Daubert*; and

(3) the testimony [will] assist[ ] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1183 (11th Cir. 2013). The party offering the testimony must meet each prong by a preponderance of the evidence.

### 1. Prong One: The Expert Must Be Qualified To Testify to the Relevant Issue

To meet Prong One, a party must show that the expert has sufficient "knowledge, skill, experience, training, or education" to form a reliable opinion about the relevant issue. *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010). Experience in a particular field is not enough to qualify an expert; the expert must have experience with the issue before the court. *See id.* at 1201.

### 2. Prong Two: The Expert's Opinion Must Be Sufficiently Reliable

To meet Prong Two, the party proffering the expert's testimony must show that the expert's opinion is sufficiently reliable. A district court has substantial discretion in deciding how to test the reliability of an expert's testimony. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). "This deferential abuse of discretion standard is applied stringently, even if a decision on expert testimony is 'outcome

determinative.'" *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296 (11th

Cir. 2014) (citing *Joiner*, 522 U.S. at 142-43, 118 S. Ct. at 517).

Pursuant to the second *Daubert* prong, the court should consider the following

factors: "(1) whether the expert's methodology can be tested; (2) whether the expert's

scientific technique has been subjected to peer review and publication; (3) whether

the method has a known rate of error; and (4) whether the technique is generally

accepted by the scientific community." *Rink*, 400 F.3d at 1292 (citing *Quiet Tech.*

*DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

However, these factors are not exhaustive and a court "should consider any additional

factors that may advance its Rule 702 analysis." *Quiet Tech*, 326 F.3d at 1341.

"The same criteria that are used to assess the reliability of a scientific opinion

may be used to evaluate the reliability of non-scientific, experience-based testimony."

*Frazier*, 387 F.3d at 1262.

### 3. Prong Three: The Expert's Opinion Must Be Helpful

"The final requirement for admissibility of expert testimony under Rule 702 is

that it assist the trier of fact." *Frazier*, 387 F.3d 1262. That means that " expert

testimony is admissible if it concerns matters that are beyond the understanding of the

average lay person." *Id.* (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.

1985)). "Proffered expert testimony generally will not help the trier of fact when it

offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63 (citing 4 *Weinstein's Federal Evidence* § 702.03[2] [a]).

## C. <u>Lack of Necessity of a Daubert Hearing</u>

Whether a *Daubert* hearing is necessary is a decision within the sound discretion of a district court. *Cook*, 402 F.3d at 1113. The abuse of discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion . . . [i]ndeed, the Rules seek to avoid unjustifiable expense and delay as part of their search for truth and the just determination of proceedings." *Kumho*, 526 U.S. at 139, 152-53 (internal citations omitted). There is no requirement that a *Daubert* hearing always be held. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001); *Frazier*, 387 F.3d at 1264.

In this case, Patel requested a hearing, merely arguing (without specificity) that "some of the issues raised by [D]efendants are not straightforward." (Doc. 118 at 3); (Doc. 123-1 at 5). The Court disagrees. After extensively reviewing the parties' briefs and the record, the Court determines that a *Daubert* hearing is not necessary.

## IV. ANALYSIS

### A. <u>Dr. Cummings</u>

Patel offers the opinions of Dr. Cummings into evidence in this case. Dr.

Cummings has offered an expert report. (Doc. 84-3, the "Cummings Report").[2] Dr. Cummings also offered a supplemental expert report and declarations; however, both of those documents were stricken in separate orders. (Doc. 85) (striking the supplemental report); (Doc. 132) (striking the supplemental declarations). Dr. Cummings was deposed on May 17, 2017, and the deposition transcript was filed into the record. (Doc. 101-16, 101-17, the "Cummings Deposition").[3]

On September 8, 2017, Defendants filed their Joint Motion To Exclude Dr. Cummings's testimony and brief in support. (Doc. 95); (Doc. 96). Patel responded on October 2, 2017. (Doc. 118). Defendants replied on November 15, 2017. (Doc. 133). Defendants challenge Dr. Cummings's "qualifications and methods" under Federal Rule of Evidence 702. (Doc. 95 at 4-5) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). Defendants move to exclude this testimony "from consideration on summary judgment or introduction at trial." (Doc. 95).

### i. *Dr. Cummings's Qualifications*

Dr. Cummings has been offered by Patel to give his calculations regarding

---

[2]  The page numbers for the Cummings Report refer to the actual page numbers from the report, not the page numbers supplied by CM/ECF.

[3]  The page  numbers for the Cummings Deposition refer to the actual page numbers from the transcript, not the page numbers supplied by CM/ECF.

Patel's head's velocity, "the biomechanical aspects of the takedown," and to assist the jury with understanding what they would see on the video. (Doc. 118 at 1-3). Dr. Cummings is a two-time graduate of the University of North Carolina at Chapel Hill. (Cummings Report at 49). He has a Ph.D. in biomedical engineering and a B.S. in applied and materials science with minors in physics and chemistry. (*Id.*). Among other jobs, he has worked as a post-doctoral fellow, biomedical engineer, accident reconstructionist, and most recently as the principal consulting scientist and biomedical engineer at Cummings Scientific, LLC. (*Id.*). He claims that his work is split close to evenly for plaintiffs and defendants. (*Id.*). Among his skills he includes injury causation, biomechanics, computer based accident reconstructions and simulations, and photogrammetry.[4] (*Id.* at 50-51). He claims membership in the Biomedical Engineering Society, American Society of Biomechanics, American Society of Safety Engineers, Society of Automotive Engineers, and the Association for the Advancement of Automotive Medicine. (*Id.* at 51). He has participated in numerous conferences, published writings, and given talks. (*Id.* at 51-54). Finally, his Rule 26 list names numerous cases in which he has participated as an expert within

---

[4] Dr. Cummings's resume states the following as to photogrammetry:

**Photogrammetry** of digital and scanned photos using a variety of CAD programs and Photomodeler to analyze skid patterns, crush depths, and accident scenes.

(*Id.*).

the last four years. (*Id.* at 53-62). At his deposition, he estimated that he has been deposed "probably about a hundred times." (Cummings Deposition at 6). He also estimated that he has testified in court "50 times or so." (*Id.*).

### ii.    Dr. Cummings's Opinions

In the Cummings Report, Dr. Cummings offers the following opinions:

1)    Mr. Patel's neck underwent an extension injury as his head was slammed into the ground.

2)    Mr. Patel was 57 years of age at the time of this incident.

3)    A 57 year old male would require a torque of approximately 20 N*m to cause the extension type injury to C6-C7 that Mr. Patel suffered in this event.

4)    A 57 year old male would require a torque of approximately 17.7 N*m to cause the extension type injury to C5-C6 that Mr. Patel suffered in this event.

5)    Mr. Patel was NOT walking away from police officers when Officer Parker swept his legs and slammed him into the ground.

6)    Mr. Patel's head velocity was minimal in the time period immediately before Officer Parker's leg sweep.

7)    After Officer Parker's leg sweep, Mr. Patel's head velocity exceeded that which would be applied to his head simply due to gravity.

8)    Officer Parker kicked Mr. Patel's legs with sufficient force to knock his shoe off.

9) The kicking force applied by Officer Parker imparted a rotational movement about Mr. Patel's body. This additional rotational inertia cause Mr. Patel to experience acceleration faster than the normal acceleration due to Earth's gravity when his head hit the ground.

(Cummings Report at 4). In coming to these conclusions, Dr. Cummings reviewed several sources. (*Id.* at 48). Among those sources were videos of the incident, medical records, trial testimony, an acquittal memorandum, and an investigative report. (*Id.*). Additionally, Dr. Cummings reviewed several publications. (*Id.*).

Much of the Cummings Report takes stills from the COBAN video and calculates Patel's head velocity. (*Id.* at 7-40). He then contrasts his calculations to a fall "due to gravity." (*Id.* at 41).

### iii. *Defendants' Motion Is Due To Be Granted.*

#### 1. **Dr. Cummings Is Not Qualified.**

Defendants contest Dr. Cummings's qualifications as a forensic video analyst. (Doc. 96 at 10). During the course of his examination of the incident, Dr. Cummings used photogrammetry. (*Id.* at 10-11). Photogrammetry "involves taking measurements from still photographs." (*Id.*). In this case, Dr. Cummings had "the COBAN MPEG2 video from Officer Spence's patrol vehicle." (*Id.*). He used those measurements to calculate the speed and velocity at which Patel hit the ground during the incident. (*Id.*).

To respond to Dr. Cummings, Defendants employed "Grant Fredericks, a Certified Video Analyst." (*Id.* at 11). Fredericks submitted a declaration and expert report in connection with the Cummings Motion. (Doc. 97-3, Fredericks Declaration); (Doc. 97-4, Fredericks Report).[5] Patel deposed Fredericks on August 7, 2017. (Doc 97-7, Fredericks Deposition). Fredericks is a teacher at the FBI National Academy and a consultant for the video recording system at issue in this case. (Doc. 96 at 11).

Defendants use Fredericks to argue that Dr. Cummings lacks the necessary qualifications to do the sort of video analysis he attempted to do in this case. (*See id.* at 12). Fredericks explained the nature of COBAN MPEG2 videos and how they are encoded. (*Id.* at 12-16). Defendants contrast this with Dr. Cummings's shortcomings in his own knowledge of these videos. (*Id.*); (*See also* Cummings Deposition at 271, 276-79). Fredericks concluded that the video "was never intended to be accurate for the purpose you are attempting to use it," namely to determine the speed/velocity by which Patel hit the ground. (Doc. 96 at 15). Finally, Defendants point out that, at his deposition, Dr. Cummings denied knowing about any "peer-reviewed scientific publications that support using a compressed digital video image . . . to compare the speed of a falling person versus what happened to Mr. Patel[.]" (Cummings

---

[5] The Fredericks Report was conventionally filed. For that reason, the page numbers refer to the page numbers on the actual document.

Deposition at 277).

In response, Patel points out that Defendants do not argue that "Dr. Cummings is not a qualified biomechanical expert." (Doc. 118 at 1). However, Defendants reply by noting that they spent the first portion of their brief challenging Dr. Cummings's qualifications as a forensic video analyst. (*See* Doc. 133 at 10-11).

In this case, it is evident to the Court that Dr. Cummings is not qualified to do the sort of work that he purported to do. In his deposition, Dr. Cummings displayed an unfamiliarity with the technical details of the video that one would expect an expert to possess. (*See* Cummings Deposition at 271, 276-78). The contrast between the level of understanding Dr. Cummings demonstrated at his deposition to the explanations of a consultant for the very company that produces the COBAN video system is notable. (Doc. 97-3 at 4-7). Dr. Cummings also admitted the lack of peer-reviewed publications that endorse the methodology he purported to perform. (Id. at 277).

For these reasons, Dr. Cummings is unqualified to do the sort of scientific analysis that he purported to perform in this case. Under these facts, the Court is compelled to exercise its role as a "gatekeeper." *See* 509 U.S. at 592–93, 113 S. Ct. at 2796. Dr. Cummings may be an expert in some areas, but he is not an expert in the photogrammetry of a video system he does not adequately understand. (Cummings

Deposition at 176) (lacking understanding of the video encoding process). His deposition displays a worrisome deficiency in the knowledge expected from an expert. (Cummings Deposition 269, 271) (displaying an inadequate knowledge on issues such as GOP and predictive vs. bidirectional frames); (*see also* Fredericks Report at 34-37).

Dr. Cummings also stated the following in his deposition:

Q    What forensic video analysis training have you had in the course of your career, if any?

A    I don't know that there really is a whole lot out there.
I mean, so my basic education in optics and in photogrammetry, really the video analysis isn't any different from regular photogrammetry. The only difference is that we're still taking still frames from the video. The optics of the camera isn't changing.

(Cummings Deposition at 251). Yet, Fredericks noted that "there are a number of Forensic Video training courses available throughout the United States to both the private and public sector engaging in the analysis of digital multimedia evidence (DME)." (Fredericks Report at 41). Finally, Dr. Cummings admitted having no forensic video analysis certifications, though he claims that "the photogrammetry coursework is applicable to videos." (Cummings Deposition at 252).

> **2.    Dr. Cummings's Opinions on Patel's Head Movement and Mechanisms of Injury Are Not Based on any Reliable Methodology.**

Defendants also argue that Dr. Cummings's testimony on Patel's head movement are due to be excluded as unreliable. (Doc. 96 at 17-40). They point to the problems with bidirectional and predictive images, de-interlacing, aspect ratios, and the field of view. (*Id.* at 17-22). They argue that Dr. Cummings placed measurement points on the video in an unreliable way (*id.* at 22-27), that Dr. Cummings's error rate is too high (*id.* at 28-30), and that he failed to use an inverted pendulum (*id.* at 30-33).

Defendants also argue that Dr. Cummings's testimony on the mechanisms of Patel's injuries are due to be excluded. (*Id.* at 33). They argue that "Dr. Cummings failed to account for the effects of severe preexisting degenerative changes to [Patel's] spine, misapplied the available peer-reviewed data, misrepresented the applicable standard deviation, and developed his torque calculations exclusively by borrowing from a study that lacked any relevant underlying data." (*Id.* at 33).

In response, Patel relies on Dr. Cummings's stricken declarations. (Doc. 118 at 2).[6] Patel terms this situation as "the expert version of he-said-she-said," and that "any issues raised go to the weight and not to the admissibility of Cummings'[s]

---

[6] Other than Dr. Cummings's stricken declarations, Patel only ever cites to Mkandawire's deposition. He cites to no cases or statutes to support his arguments. For this reason, Patel's arguments are underdeveloped. Courts do not have "to construct arguments that [a party] has failed to raise and that are not reasonably presented in the court file." *Jones v. Pilgrim's Pride, Inc.*, 741 F. Supp. 2d 1272, 1275 (N.D. Ala. 2010) (Hopkins, J.) (citing other sources). While this is not a case where Patel has completely failed to respond, as was the case in *Jones*, it still stands that Patel's arguments are too thin. *See id.*

calculations and are a basis for cross-examination, not exclusion." (*Id.* at 2). Alternatively, Patel claims that Dr. Cummings's testimony is really "about the biomechanical aspects of the takedown, including a refutation of Parker's claim that he lost his balance and that Patel resisted." (*Id.* at 2). Patel fails to cite any authority for this proposition. (*Id.*).

The Court is convinced that Dr. Cummings's opinion is not based on any reliable methodology. As stated above, he is not qualified to do the sort of forensic analysis that he purported to do. Additionally, his analysis is flawed because of his use of the interlaced video (Fredericks Deposition at 38),[7] among other issues.

---

[7] As Fredericks explains, "[t]he COBAN In-car Video systems in both the Spence and Parker vehicles produced interlaced video images. Cummings failed to deinterlace the video frames into their two unique and independent images prior to conducting his photogrammetric measurements." (Fredericks Deposition at 38). "Interlacing was developed to accommodate the timing requirements and display limitations of CRT (Cathode Ray Tube) displays." (*Id.*).

Fredericks explains why de-interlacing matters:

When attempting to print or capture a picture from an analog video image, both fields of video are captured as a single picture called a frame. A frame is comprised of two separate images. If there is little to no motion in the video frame, there is little difference between the two fields of video and they will appear almost identical. However, when motion occurs between the field timing, the objects in motion are in different positions within the captured frame and their positions represent different time periods, separated by 16.7 ms. Interlacing artifacts are visible in an interlaced video frame with motion, as we see in both the Spence and Parker videos.

In order to examine the two unique interlaced video images correctly, the images must be de-interlaced. Deinterlacing interlaced video requires the two fields to be separated into individual images. By necessity, the odd-numbered deinterlaced field fills in the missing even lines of information with interpolated pixel data in order to

Further, it would be an odd result if the Court were to admit Dr. Cummings's opinions without the underlying calculations, as Patel seems to contemplate. (*See* Doc. 118 at 2).[8] While he consulted sources other than the video, it is evident that the lion's share of his analysis is dependent on the validity of his analysis and calculations from the video. (*See* Cummings Report at 4-5). Dr. Cummings states that "the bases of [his] opinions are given in the [discussion section]." (*Id.* at 4). However, in the discussion section, Dr. Cummings relies on his calculations. (*Id.* at 5). Dr. Cummings also recites information from the police report and summarizes the medical report, but there is no clear indication how they played into his opinions. (*Id.*).

For the aforementioned reasons, the Court finds that Dr. Cummings's testimony

---

maintain the correct aspect ratio of the image. Likewise, each deinterlaced even-field fills in the missing odd lines of information during the deinterlacing process. If the missing lines per field were not filled in, the images will either be presented displaying half the height of the picture and would appear squished, or there would be black or white spaces between every other line of the image, making the image difficult to perceive. Because the missing lines are filled in when a frame is deinterlaced, photogrammetric measurements must consider the half resolution data, resulting in doubling the potential error rate of calculations.

(*Id.* at 39).

[8] Patel states that "[e]ven if Cummings' calculations are excluded, though they should not be, Cummings'[s] basic opinions are not about calculations, but about the biomechanical aspects of the takedown, including a refutation of Parker's claim that he lost his balance and that Patel resisted." (Doc. 118 at 2).

is unreliable.

### 3. Dr. Cummings's Lay Opinions Will Not Aid the Jury.

Defendants also contend that Dr. Cummings's opinion testimony whether Patel walked away from the officers is not helpful to the jury. (Doc. 96 at 40-43). In response, Patel argues that Dr. Cummings's "frame-by-frame analysis" is "not easily duplicated in the jury room" and "lay persons would not ordinarily have the education, training, and experience to fully understand the forces involved in the takedown or the significance of all of the biomechanical components of it." (Doc. 118 at 3).

Whether viewed as lay testimony or expert testimony, Dr. Cummings's opinions from watching the video are not helpful to the jury. "Rule 701(b) 'helpfulness' requirement is satisfied as to lay opinions of video or photographic evidence only where the witness is better able to observe, understand or interpret the contents of that video or photograph than the jury is." *Kirksey v. Schindler Elevator Corp.*, No. 15-0115-WS-N, 2016 WL 5239874 at *8 (S.D. Ala. Sept. 21, 2016) (granting a motion excluding testimony regarding actions depicted on video). Under Rule 702, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. . . . Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties

can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

In this case, a jury is capable of watching the video and determining for themselves what happened. No special degrees, training, or experience is required to watch a video and determine if Patel made any movements prior to the incident.[9] Patel has not cited a single case holding otherwise. (*See generally* Doc. 118). "[T]he jury will be perfectly capable of watching the video and reaching an independent conclusion based on the evidence presented." *Kirksey*, 2016 WL 5239874 at *8.

For this reason, the Court finds that Dr. Cummings's opinions are unhelpful to the jury.

### 4. Dr. Cummings's Opinions Not Contained in the Rule 26 Report

Defendants contest what they term as "undisclosed opinions", the opinions Dr. Cummings expressed that were not included in his Rule 26 report. (Doc. 96 at 43-47). In particular, Defendants contest:

- Dr. Cummings's testimony on whether Patel "'jerk[ed] away' immediately before the takedown." (*Id.* at 44) (citing Cummings Deposition at 27-28, 30).

---

[9] Dr. Cummings himself even appeared to give somewhat conflicting testimony at his deposition about his beliefs about what a juror could figure out from snapshots from the video. (*See* Cummings Deposition at 26-30).

- Dr. Cummings's testimony on whether Officer Parker lost his balance during the takedown. (*Id.* at 46) (citing Cummings Deposition at 33-34).

- Dr. Cummings's testimony on whether Patel had "time to get his arms free in order to cushion his fall." (*Id.* at 46-47) (citing Cummings Deposition at 114-15).

Defendants claim that these opinions prejudiced them because they were "unable to examine and consider the opinions prior to deposing Dr. Cummings" and "they were unable to share with their own experts a Rule 26 report that explained the basis of such opinions and the facts and data supporting them." (*Id.* at 47).

In response, Patel seems to acknowledge that these opinions are absent from the Rule 26 report, instead calling them "minor omissions." (*See* Doc. 118 at 2-3). However, Patel argues that Defendants did not suffer any prejudice. (*Id.*) ("[D]efendants deposed Dr. Cummings at length and did so with the assistance of two experts."). Patel also argues that the opinions are not missing from the report, but are rather implications from the "affirmative opinions." (*Id.* at 2-3). In support, Patel relies on Dr. Cummings's stricken declarations. (*Id.* at 3).

Rule 26 is clear that an expert report has to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26 (a)(2)(B). "Rule 26(a) expert reports must be 'detailed and complete,' they must

not be sketchy, vague, or preliminary in nature." *U.S. v. Ala. Power Co.*, 274 F.R.D. 686, 688 (N.D. Ala. 2011) (Hopkins, J.) (citing other sources). "Rule 26 disclosures must be made at the times and in the sequence a court orders." *Id.* "Federal Rule of Civil Procedure 37(c)(1) provides that '[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless.'" *Id.* (citing *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008)). The Court has reviewed Dr. Cummings's challenged opinions.

First, regarding the opinion on whether Patel "jerked away," the Court determines that this information was not fairly presented in the Cummings Report. (Cummings Report at 4). Dr. Cummings himself even admitted that he did not see a conclusion in his report relating to Patel's hand or arm movement before the takedown. (*See* Cummings Deposition at 31). It is difficult for Defendants to depose Dr. Cummings on a topic that he did not include in his report. (*See id.* at 32).

Second, regarding the opinion whether Officer Parker lost his balance during the takedown, the Court determines that this information was not fairly presented in the Cummings Report. (Cummings Report at 4). Dr. Cummings admitted that he did not have a conclusion in his report that Parker did not lose his balance during the

22

takedown; however, he claims that he analyzed the "leg sweep." (Cummings Deposition at 34). The issue whether or not Officer Parker lost his balance is absent from Dr. Cummings's conclusions. (Cummings Report at 4). While the Cummings Report talks about the leg sweep, Dr. Cummings does not explicitly conclude that Officer Parker did not lose his balance. (*See id.*). He does not include any analysis of Officer Parker's balance in his discussion (*see id.* at 5), nor is it clearly raised in his figures section (*see id.* at 7-47).

Finally, the Court determines that the opinion whether Patel was able to cushion his fall is not clearly presented in the Cummings Report and, for that reason, it should be excluded. (Cummings Report at 4-6).

### *iv.    Conclusion*

In conclusion, Dr. Cummings is not qualified to do the sort of analysis that he purported to do in this case, his opinions are not reliable, and his opinions would not be helpful to the jury. Accordingly, the Cummings Motion is **GRANTED**, and his testimony is **EXCLUDED** from consideration at summary judgment and at trial.

### B.    Jerry Wiley

Patel offers the opinions of Jerry Wiley into evidence in this case. Wiley has offered an expert report. (Doc. 113-5, the "Wiley Report"). Wiley was deposed on May 23, 2017, and the deposition transcript was filed into the record. (Doc. 113-1,

113-2, the "Wiley Deposition").

On September 11, 2017, Defendants filed their Joint Motion To Exclude Wiley's Testimony and brief in support. (Doc. 111); (Doc. 112). Patel responded on October 9, 2017. (Doc. 123-1). Defendants replied on November 15, 2017. (Doc. 134). Defendants challenge Wiley's qualifications and "unvarnished legal opinions" under Federal Rule of Evidence 702. (Doc. 112 at 1-5) (emphasis omitted) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). Defendants move to exclude this testimony "from consideration on summary judgment or introduction at trial." (Doc. 111 at 3-4).

### i. *Wiley's Qualifications*

Wiley is a graduate of the West Jefferson High School. (Doc. 113-5 at 26). He did not obtain a degree from a college, but he did take Photography II at the University of New Orleans. (*Id.*). He was first employed with the Orleans Parish Sheriff's Office in New Orleans before joining the Birmingham Police Department in 1986. (*Id.* at 20). His final position with the Birmingham Police Department was Assistant Commander of the Patrol Bureau. (*Id.* at 21-22). Before then, he was a Commander of West Precinct, Assistant Commander of Administrative Division, Lieutenant Patrol Division, Group Supervisor of HIDTA/DEA Task Force, Sergeant, Vice Narcotics Unit, Narcotics Detective, Vice/Narcotics & Technical Surveillance

Unit, and Patrol Division. (*Id.* at 20-24).

Since 1990, he has attended six significant[10] continuing education/training courses. (*Id.* at 23). He has attended several other law enforcement continuing education courses. (*Id.* at 24-26). However, most of these courses are not related to police use of force. (*Id.*). He was awarded the Police Star Medal in 1991. (*Id.* at 26).

### ii.     *Wiley's Opinions*

Wiley offers several opinions throughout his analysis. (Doc. 113-5 at 1-16). Excerpts of those opinions include:

> Officers Slaughter['s] and Parkers['s] initial interaction with Mr. Patel was objectively reasonable and within proper police policy and training under the circumstances known to them at the time they observed him.
>
> . . .
>
> Off. Parker relies upon no reasonable articulable facts that Mr. Patel was currently involved in, or had previously been involved in criminal activity as required by *Terry v. Ohio*, and in common police training and practices. The only "fact" that Off. Parker admits he relies on is that a "known complainant" had called reporting suspicious activity. At no point during his trial testimony, in his interview with Lt. Kamus during the Madison Police Department[']s IAD investigation, or any other documentation I have reviewed, does Off. Parker cite any objective, articulable facts to support further

---

[10]  Wiley explains his list of these six courses as the "courses [that] cover the most common issues that police departments face." (*Id.* at 23). None of these courses explicitly state that they covered the police use of non-deadly force, but one of the courses was on "Officer Involved Shootings." (*Id.*).

compelled detention and questioning of Mr. Patel.

It is my opinion that Off. Parker acted contrary to common police practices and training, and violated Madison Police Department Policy as well as the Fourth Amendment of the U.S. Constitution, by compelling Mr. Patel to answer his questions without reasonable suspicion or probable cause.

. . .

It is my opinion that Off. Parker acted contrary to common police practices and training, and violated Madison Police Department Policy as well as the Fourth Amendment of the U.S. Constitution, by conducting a frisk (Terry Frisk) [sic] of Mr. Patel's person without reasonable suspicion or probable cause.

. . .

Off. Parker conducted an unconstitutional pat down ([*Terry*] Frisk) of Mr. Patel, during which he did not and Off. Slaughter did not find any weapons. Regardless, Off. Parker while controlling the hands of Mr. Patel behind his back, decided to use unnecessary force to throw him to the ground face first. This was quite literally a seizure of Mr. Patel's person without a warrant, probable cause, reasonable suspicion or any exigent circumstances.

(Doc. 113-5 at 1-17). During one of his conclusions, Wiley explains the alternative options open to Officer Parker, instead of the takedown. (*Id.* at 12-13). Finally, Wiley concludes by stating "that Off. Parker knew he had no legally justifiable reason to use force against Mr. Patel but decided to do so anyway. This action was contrary to commonly acceptable police practices and training." (*Id.* at 16).

### iii. *Defendants' Motion Is Due To Be Granted*

## 1.    Wiley's Qualifications

Defendants claim that Wiley is not qualified as an expert witness. (Doc. 112 at 25). They portray Wiley as relying solely on his "training and experience" to create the expert report. (*Id.* at 26). Defendants argue that "Wiley's qualifications to provide expert opinions on the use of force are plainly lacking in each of these respects." (*Id.*).

Defendants argue that Wiley's training is lacking. (*Id.*). In support, they argue "that he has not received any formal training on the standards governing use of force or suspect takedowns since he attended the Birmingham Police Academy over 30 years ago." (*Id.* at 26). They argue that he is unfamiliar with the Strategic Self-Defense & Gunfighting Tactics and the Pressure Point Control Tactics standard training programs. (*Id.*). Additionally, they argue that he is unfamiliar with current Birmingham Police Academy training or standards from the Alabama Peace Officers' Standards and Training Commission. (*Id.* at 27). Defendants portray Wiley's resume as containing merely "six training courses spanning a period of twenty-five years." (*Id.* at 28) (emphasis omitted).[11]

---

[11]    The Court notes that this is an unfair portrayal of Wiley's CV. While Wiley's CV lists six training programs specifically, it appears that he merely singled those programs out because "[he believed] these courses cover the most common issues that police departments face." (Wiley CV at 7). Wiley then gives a far longer list <u>on the very next page</u>, including more law enforcement training. (*Id.* at 8-10). From a plain reading of the titles of the trainings, not all of them included the use of force, but some probably did. (*Id.*) (containing courses named "Law Enforcement and Civil Rights Conference," "Critical Incident Stress Training," "Investigations of Officer Involved Shootings," "High Risk Entry Techniques," and "Street Survival for Police

Defendants argue that Wiley's experience is lacking. (*Id.* at 29). They analogize the present case to that a case from the Northern District of Georgia. (*Id* at 30) (citing *American General Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1313 (N.D. Ga. 2008)). They argue that Wiley did not specially focus on the use of force in his job, "was not accredited in his field of supposed expertise and had no other evidence of proficiency in that field," and did not create use of force policies. (*Id.* at 27-29). To the extent he did review "use-of-force incident reports," Defendants characterize his role as surface-level. (*Id.* at 29) (noting that Wiley did not rule on whether the use of force was proper, he just sent the report to his superiors).

In response, Patel asserts that the "challenge to [Wiley's] qualifications goes only to the weight of his testimony and not to admissibility." (Doc. 123-1 at 2). Patel distinguishes *Ward* by stating that "[t]he expertises required to testify concerning the science of document examination cannot be compared with the experience-based expertise of police experts." (*Id.*).

Patel urges the Court to follow the decision in *Jones v. City of Albertville*. (*Id.* at 3) (citing *Jones v. City of Albertville,* No. CV-12-S-96-NE, 2014 WL 5473999 (N.D. Ala. Oct. 28, 2014)).[12] Patel says that Wiley is not required to be able "to cite

_____

Officers." (*Id.* at 8-10).

[12] The court in *Jones* stated:

28

cases by name." (*Id.*). He argues that Wiley is there to provide context, especially given that Defendants have their own expert witness. (*Id.* at 4).

In this case, Wiley is not qualified as an expert witness able to testify about the use of force. In its discretion, the Court finds that Wiley's career does not qualify him, under any prong of Rule 702, to be an expert witness on the use of force. While he started out at a low level in the police force, and worked his way up in the Birmingham Police Department,[13] his training, experience, and demonstrated knowledge at his deposition <u>specifically on the use of force</u> is deficient. (*See e.g.* Wiley Deposition at 47-49[14], 87, 167, 284-286); (*see* Doc. 112 at 25-32).

---

Officer Maher contends that Busken is not qualified to testify as an expert because he does not have any special education or training in police practices, tactics, or deadly force decision making, his experience in pursuits and the use of force as a law enforcement officer is limited, and his experience as Chief of Police is not sufficient.

As previously noted, however, more than twenty of Busken's thirty years of law enforcement experience was spent as a Chief of Police. As such, he participated in numerous investigations of pursuits and the use of force. Therefore, he is qualified to offer testimony concerning relevant, generally-accepted police standards and procedures, and to state whether, in his opinion, Officer Maher adhered to such standards. *See* [FED.R.EVID.] 702(a) (providing that a witness may be qualified as an expert by virtue of his "knowledge, skill, experience, training, or education").

*Jones*, 2014 WL 5473999, *5 (internal footnotes omitted). However, *Jones* is of limited help to Patel because Wiley was never a Chief of Police. (*See* Wiley Report at 20-22). Further, while the expert in *Jones* spent 20 years as the Chief of Police, Wiley spent only about 12 in what Patel terms "command-level experience." (*See* Doc. 123-1 at 2).

[13] (Doc. 113-5 at 18-24).

[14] When asked about different training protocols, Wiley stated: "I'm not sure what our academy teaches." (Wiley Deposition at 48). This is something basic that an expert on the use of

It is true that Wiley does not have to "be recognized as a leading authority in the field in question. . . . Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony[,] not its admissibility. Thus, Rule 702 takes a liberal approach to expert witness qualification." *Leathers v. Pfizer,* 233 F.R.D. 687, 692 (N.D. Ga. 2006) (quoting 29 Wright & Gold, FEDERAL PRACTICE AND PROCEDURE; Evidence § 6265 (West 1997)). However, Wiley has not crossed that minimum threshold necessary to qualify him as an expert. There may be many areas where Wiley could be considered an expert, but the use of force is not one.

## 2. Wiley's Legal Conclusions

Defendants contest what they term as Wiley's legal conclusions. (Doc. 112 at 10) ("To the extent that Mr. Wiley affirmatively concludes that Officer Parker violated the Fourth Amendment by acting without reasonable suspicion or probable cause or using excessive force, such opinions invade the province of the Court and the jury and must be excluded."). In support, Defendants cite the Eleventh Circuit in *Samples v. City of Atlanta*, 916 F.2d 1548 (11th Cir. 1990) for the proposition that experts should not "invade the province of the jury" by answering questions going to the reasonableness of an officer's actions. (*Id.* at 11-12) (citing *Samples*, 916 F.2d at

---

force would know.

1551).[15] They also cite numerous authorities stating that experts cannot testify as to legal questions. (*Id.* at 12-15).

In response, Patel appears to concede this point. (Doc. 123-1 at 1) ("Patel does not dispute that neither party's expert can establish the law. That is the Court's job.").

The court in *Jones* stated the applicable principle well:

> [I]t is the role of the judge, and not an expert witness, to instruct the jury on the applicable principles of law. As the Eleventh Circuit has stated: " 'Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact.'["] *United States v. House*, 684 F.3d 1173, 1209 (11th Cir.2012) (quoting *United States v. Oliveros*, 275 F.3d 1299, 1306–07 (11th Cir.2001)). In other words, "[a]n expert may not ... merely tell the jury what result to reach," and "[a] witness also may not testify to the legal implications of conduct." *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir.1990) (citations omitted, alterations supplied). Instead, "the court must be the jury's only source of law." *Id.* (citations omitted).

*Jones*, 2014 WL 5473999, at *8 (excluding an expert's legal conclusions). For these reasons, the Court **EXCLUDES** any of Wiley's testimony that gives legal conclusions.

### 3.    Wiley's Lay Opinions

---

[15]  The problem with the question in *Samples* was that it blatantly asked the expert to determine if the officer-in-question's actions were reasonable. *See Samples*, 916 F.2d at 1551. The court did not take issue with the other questions posed. *See id.* ("We find, however, that the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement.").

Defendants also move to exclude Wiley's lay opinions. (Doc. 112 at 21). First, they object to Wiley's "opinion that Officer Parker 'was consciously documenting a narrative to justify his use of force against Mr. Patel.'" (*Id.* at 21) (quoting Wiley Report at 14). Second, they object to "[Wiley's] opinions that [Patel] did not pull away[16] from the officers, that [Patel] did not flee them, and that [Patel] was trying to answer the officers' questions." (*Id.* at 22-23) (footnote added). In support of their argument, Defendants cite to *Kirksey* for the idea that "members of the jury can review the video at trial and draw their own conclusions about what it depicts." (*Id.* at 23-24) (citing *Kirksey*, 2016 WL 5239874 at *8). Basically, Defendants argue that Wiley's opinions "invade the province of the jury and are there unhelpful to the factfinder." (Doc. 112 at 24).

In response, Patel claims that "Wiley is not merely stating what is on the video; he is using his experience to put Parker's statements on the video in context." (Doc. 123-1 at 4). Patel also claims that this testimony is helpful to a jury because it will aid in Patel's "credibility battle" and will help jurors understand "why officers lie on videos about what suspects are doing." (*Id.* at 5).

In Wiley's deposition, he admitted that, in coming to his opinion on whether

---

[16] Defendants also challenge Wiley's opinion that "[Patel] did not 'jerk away' from Officer Parker. (*Id.* at 20).

Officer Parker was documenting a narrative, he just "read all of the statements that [Officer Parker] made and then I watched the video. And the statements [Officer Parker] made did not jive with what was on the video." (Wiley Deposition at 297).Wiley admitted that this testimony was not based on any scientific principle. (*Id.* at 298). Further, it did not appear to be based on any training and experience. (*Id.*).

In this case, Wiley's lay opinions on these issues are not helpful to a jury. A jury is capable of watching the video and determining for themselves these disputed fact issues. Patel's counsel can question officers about their in-video statements versus what the video shows. Counsel also are able to make arguments in their closing. It would be improper to allow "expert" testimony when that expert does not seem to be relying on anything other than his own judgment that does not rely on training and experience. For these reasons, Wiley's lay opinions are **EXCLUDED**.

### 4. Wiley's Opinions on Prevailing Law Enforcement Standards Are Unreliable.

Defendants also question the reliability of Wiley's opinions on prevailing law enforcement standards. (Doc. 112 at 32). They raise several objections. (*Id.* at 32-45). First, they point out that "Wiley failed to consider a variety of relevant materials from the criminal trials of Officer Parker." (*Id.* at 33) (citing Wiley Deposition at 216-18,

226-27, 291-92).[17] Second, they argue that "Wiley's wholesale lack of knowledge regarding both prevailing standards of law enforcement and the legal decisions underlying those standards results in a methodology that is utterly unreliable." (Doc. 112 at 35).[18] Finally, they conclude by stating that Wiley misapplied whatever methodology he was using. (*See id.* at 45).

In response, Patel says that Wiley is not required to be able to cite cases by name and that Defendants' arguments are for cross-examination. (Doc. 123-1 at 3-4). The Court finds that Wiley's testimony is insufficiently reliable. While Wiley cited *Graham v. Connor* in his report, he was unable to discuss it at his deposition because of his unfamiliarity with it. (*See* Wiley Report at 10); (*See* Wiley Deposition at 87). The Court does not expect expert witnesses to be able to rattle off case names; however, the Court does expect purported experts to be able to display a level of familiarity <u>with the cases that they cite in</u> their own report. And, given the importance of the *Graham v. Connor* decision in use of force cases, it expects that a supposed

---

[17] As an example, Defendants point out that Wiley did not consider Patel's testimony, though he admitted that it was relevant. (Wiley Deposition at 268-69).

[18] In support, they argue that Wiley is unfamiliar with the Supreme Court decisions in *Terry* and *Graham*. (Doc. 112 at 35-36). They also argue that he is "unfamiliar with the prevailing standards governing searches, seizures, and uses of force by law enforcement officers in the State of Alabama." (*Id.* at 36-37). Defendants posit that Wiley "reached his opinion on prevailing police practices" by using the IACP model policy and his own "common sense." (*Id.* at 38). At his deposition, Wiley admitted that he had not researched his opinion that police always have to use "[t]he least amount of force to take [a suspect] into custody." (Wiley Deposition at 97). He called that opinion "common sense." (*Id.*).

expert in a use of force case would be able to discuss that case.

Defendants argue that Patel ignores their other arguments and, given Patel's thin briefing, the Court agrees. (Doc. 134 at 10). For this reason, the Court finds that Patel waived those arguments. Even if Patel had not waived those arguments, the Court is concerned by Wiley's consideration of only limited evidence and his lack of familiarity with standard police practices. (*See* Doc. 112 at 33-39). These faults make Wiley's testimony insufficiently reliable, even if the Court were to consider him an expert witness as proferred.[19]

For the aforementioned reasons, the Court finds that Wiley's testimony is due to be excluded as not reliable.

### 5. Wiley's Opinions Would Not Be Helpful to the Jury.

Finally, Defendants argue that Wiley's testimony is not helpful to the trier of

---

[19] The Eleventh Circuit in *Frazier* explained how one could be an expert, but still have unreliable testimony:

> Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341–42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

*Frazier*, 387 F.3d at 1261.

fact. (Doc. 112 at 45). They argue that his testimony "offers nothing more than what lawyers for the parties can argue in closing arguments." (*Id.*) (quoting *Frazier*, 387 F.3d at 1263-64). They also point out that allowing Wiley's testimony would be to "lend purported 'expert' support to an unscientific lay opinion regarding police practices." (*Id.* at 46) (citing *Trammell v. Paxton*, No. 2:06-CV-193, 2008 WL 7514367, at *7 (N.D. Ga. Sept. 29, 2008)).[20]

In response, Patel briefly argues that Wiley's opinions will give context to Officer Parker's actions and aid in Patel's credibility battle. (*See* Doc. 123-1 at 5).[21]

In this case, the Court is persuaded that Wiley's testimony would not be helpful to the trier of fact. There are numerous issues with the methodology and reliability of Wiley's opinions, as the Court stated above. The jury is capable of watching the video and applying their <u>own</u> "common sense." For these reasons, the Court finds that Wiley's testimony would not be helpful to the trier of fact.

### iv.    Conclusion

In conclusion, the Court excludes Wiley's testimony because he is unqualified as a use-of-force expert and his testimony is unreliable and unhelpful to the jury.

---

[20] The court in *Trammell* noted that "[g]eneralized conclusions that do not result from any meaningful application of the facts serve only to confuse, rather than assist, the jury." *Trammell,* 2008 WL 7514367, at *7.

[21] Patel cites no authority in support of his argument that Wiley's testimony will help the jury. (Doc. 123-1 at 4-5).

## V.  CONCLUSION

"[T]he trial judge's role as gatekeeper is designed to ensure that the jury, in carrying out its prescribed role, bases its determinations on relevant and reliable evidence, rather than on speculation or otherwise unreliable conjecture." *See Frazier*, 387 F.3d 1244, 1272. In performing this role, the Court "must not 'supplant the adversary system or the role of the jury.'" *Id.* This is a role that the Court takes very seriously, conscious of the impropriety of overstepping. However, Patel has not made the requisite showings required to admit either Dr. Cummings or Jerry Wiley as an expert in this case. Ultimately, Patel carried the burden on these two witnesses, a burden that he fell well short of meeting. *See Cook ex rel. Estate of Tessier*, 402 F.3d at 1107.

For the aforementioned reasons, the Court **GRANTS** the Defendants' Motions (Doc. 95, 111) and **EXCLUDES** the testimony of Dr. Cummings and Jerry Wiley.

**DONE** and **ORDERED** this the 19th day of April, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge