# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| SURESHBHAI PATEL, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No.: 5:15-CV-0253-VEH** |
| | ) |
| CITY OF MADISON, ALABAMA, | ) |
| and ERIC SLOAN PARKER, | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

This is a case about the Fourth Amendment to the United States Constitution. It arises from a takedown where Defendant Officer Parker, an officer in Defendant City of Madison's (the "City") police department (the "MPD"), used a leg sweep maneuver to put Plaintiff Sureshbhai Patel, an elderly Indian male, on the ground. As a result of this takedown, Patel suffered injuries, including permanent partial paralyzation.

Before the Court are several motions for summary judgment by the City (Doc. 99), Patel (Doc. 103), and Officer Parker (Doc. 104). Part of the City of Madison's motion was a motion for judgment on the pleadings. (Doc. 99). All of the motions are ripe for this Court's review.

For the reasons herein stated, the motions are **GRANTED** in part and otherwise **DENIED**, as set out herein.

## II.   FACTUAL BACKGROUND[1,2]

### A.   Background Before the Takedown

For the three-month period from November 1, 2014, until February 6, 2015, there were 100 burglaries in the City, two-thirds of which occurred between approximately 7:30 a.m. and 6:00 p.m. (Doc. 100 at ¶5); (Doc. 115 at 20 ¶5). Officer

---

[1]   Keeping in mind that when deciding a motion for summary judgment the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party).This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

[2]   This case presents cross motions for summary judgment. As this Court is required to do, it will consider each motion separately. However, for the statement of facts, the Court distills the relevant facts and evidence from all three motions to present a unified story of what happened. Where the parties' stories differ, the Court notes that fact. To create the statement of facts, the Court went through the briefs to ascertain what is undisputed. Oftentimes, but not always, the parties' language was copied verbatim into this opinion without quotation marks or internal citations. The Court has provided citations to the briefs.

Parker initially worked as a patrol officer for the MPD, serving for approximately two years in that position. He began working as a field training officer about two months before the events of February 6, 2015. (Doc. 100 at ¶8); (Doc. 115 at 20, ¶8). Approximately four weeks prior to February 6, 2015, Officer Parker was assigned to train new MPD Officer Andrew Slaughter. Officer Slaughter had two days left in his training with Officer Parker as of February 6, 2015. (Doc. 100 at ¶9); (Doc. 115 at 20, ¶9). Prior to February 6, 2015, Officer Parker observed that Officer Slaughter had difficulty in face-to-face interactions with subjects or citizens and was sometimes nervous in these encounters. (Doc. 100 at ¶ 10); (Doc. 115 at 20, ¶10). On the morning of February 6, 2015, Officer Parker and Officer Slaughter began their patrol shifts at 6 a.m. At the beginning of their shift, the two officers first drove through neighborhoods, ran radar in school zones, and conducted several traffic stops. They then traveled to an abandoned house for a training exercise. (Doc. 100 at ¶11); (Doc. 115 at 20, ¶11).

###    B.    February 6, 2015 – The Takedown

On February 6, 2015, Jacob Maples called the MPD in Madison, Alabama. He provided his name, address, and telephone number to the dispatcher with whom he spoke. (Doc. 107 at ¶1); (Doc. 115 at 13, ¶2); (*see also* Doc. 100 at ¶12). Maples reported seeing an individual in his neighborhood, Hardiman Place Lane in Madison,

who was standing in driveways, going into people's yards, and looking in garages and windows. Maples had lived in the neighborhood for four years, and had never seen the person before. He felt nervous leaving his wife and child at home while the man was about the neighborhood. (Doc. 107 at ¶2); (Doc. 115 at 13, ¶2); (*see also* Doc. 100 at ¶12). Maples gave a description of the individual to the dispatcher. He described the individual as a skinny black male, wearing a white or light-colored sweater, jeans, and a toboggan hat. (Doc. 107 at ¶3); (Doc. 115 at 13, ¶3); (*see also* Doc. 100 at ¶12).

Officer Eric Parker was on duty for MPD that morning. He was working as the field training officer ("FTO") for Officer Andrew Slaughter. (Doc. 107 at ¶4); (Doc. 115 at 13, ¶4). Officer Slaughter was driving Officer Parker's patrol car. Over the MPD radio, they were informed of a "check subject" call. (Doc. 107 at ¶5); (Doc. 115 at 13, ¶5). The subject was described as a skinny black male, wearing a white or light-colored sweater, jeans, and a toboggan hat. The dispatcher also relayed the suspect's activities of walking in yards, standing around driveways, and looking in garages. Maples's name was provided as well, making him a known caller. (Doc. 107 at ¶6); (Doc. 115 at 13, ¶6). Officer Spence also responded to the dispatch call. (Doc. 100 at ¶13); (Doc. 115 at 20, ¶13). Based on the information received from the dispatcher, Officer Parker believed the suspect's activities were in sequence with

burglary activities, particularly someone checking out the area and casing the houses, about which MPD had received several calls. (Doc. 107 at ¶7).[3]

The dispatcher sent updates to the mobile data terminal located in the patrol unit used by Officers Parker and Slaughter as they were en route. Specifically, the information sent to the mobile data terminal stated that the subject in question was a skinny black male wearing a toboggan, blue jeans, and a white or light colored sweater; that the subject was last seen heading northbound on Hardiman Place Lane; that the subject was walking into yards, standing in driveways, and looking around garages; and that Mr. Maples advised that he had lived there for four years, had never seen the subject, and was nervous about leaving his wife and child at home with the way the subject was acting. The information sent to the mobile data terminal also provided Mr. Maples's name, address, and phone number. (Doc. 100 at ¶14); (Doc. 115 at 20, ¶14). Officer Parker reviewed these details and read them aloud as Officer Slaughter drove toward the subject's reported location. (Doc. 100 at ¶15); (Doc. 115 at 20, ¶15).[4] Officer Parker testified that as he reviewed the information sent by

---

[3] Patel disputes these facts, but introduces no evidence to rebut it. (*See* Doc. 115 at ¶7). Patel argues that it should not be credited and is not material. (*See id.*).

[4] The Court considered evidence from the City's law enforcement expert, Jack Ryan, but did not include many of the facts relating to him for two main reasons. First, he was not present at the incident so he sheds no light regarding what happened based on his personal knowledge. Second, many of his facts attempt to apply a legal framework to the case, something that this Court is uniquely situated to do.

dispatch, he concluded that the caller's decision to identify himself contributed to reasonable suspicion that a crime may have been in progress. (Doc. 100 at ¶17); (Doc. 115 at 21, ¶17). Officer Parker testified that under the MPD's policies and pursuant to his training, when a known caller gives articulable information that indicates a crime may be in progress or have been committed, reasonable suspicion exists to detain the subject and conduct an investigatory stop to look into the situation further. (Doc. 100 at ¶18); (Doc. 115 at 21, ¶18). Officer Parker has indicated that he believed this neighborhood was a high crime area. (Parker Depo. at 316:2 to 316:14). From his experience and training as a patrol officer, Officer Parker also understood that burglars will sometimes case houses early in the morning, when most people have left their houses for work. (Doc. 100 at ¶22); (Doc. 115 at 21, ¶22). Officer Spence testified that he independently concluded that the subject in question might be involved in a burglary. (Doc. 100 at ¶25); (Doc. 115 at 22, ¶25).

Based on the available information, Officer Parker testified that he and Officer Slaughter agreed that Officer Slaughter would stop the subject and find out his name, address, and reason for being in the area. If the subject provided that information, the plan of action was to write a "miscellaneous" report describing the encounter and then return to patrol duties. (Doc. 100 at ¶27); (Doc. 115 at 22, ¶27).

The officers arrived at Hardiman Place Lane, where they saw a male individual

wearing a white sweater, jeans, and a toboggan hat, matching the given description. They also recognized him as thin and dark-skinned. Officer Slaughter parked the patrol car a few feet behind the individual, who they later learned was plaintiff Sureshbhai Patel, as he was walking down the sidewalk. (Doc. 107 at ¶8); (Doc. 115 at 13, ¶8). Officer Slaughter switched on the patrol vehicle's dashboard COBAN video system on his belt, which causes the system to begin recording audio from a microphone on his person. (Doc. 100 at ¶32); (Doc. 115 at 22 ¶32).

The officers got out of the patrol vehicle to speak with Patel. At first, Patel waved at them, but continued walking. He had one hand in his pocket. (Doc. 107 at ¶9); (Doc. 115 at 13, ¶9); (*see also* Doc. 100 at ¶33, 34). Officer Slaughter called out to him, asking to talk to Patel and for him to "come here." Patel walked towards where the officers were standing. (Doc. 107 at ¶10); (Doc. 115 at 13, ¶10). Patel recognized the officers were, in fact, police officers by the way they were dressed. (Doc. 107 at ¶11); (Doc. 115 at 13, ¶11); (Doc. 100 at ¶35). Officer Slaughter asked plaintiff what was going on. Patel responded by saying "India" and "no English." Patel then walked away from the officers, taking two steps. (Doc. 107 at ¶12); (Doc. 115 at 13, ¶12). Officer Slaughter asked Patel to "come here" again. Patel again responded with "India" and "no English." (Doc. 107 at ¶13); (Doc. 115 at 13, ¶13).

Officer Slaughter attempted to begin the investigation, asking Patel where he

was headed, for his address, and generally where he lived. Patel told the officers, "my house, my house, 148, walking." He also pointed off in the opposite direction of the officers. Then, Patel walked away a second time, taking seven steps this time. (Doc. 107 at ¶14); (Doc. 115 at 14, ¶14); (*see also* Doc. 100 at ¶¶ 43-45).

Officer Slaughter ordered Patel to stop walking. This time, the officers had to walk over to reach Patel, as he did not walk back to them as before. (Doc. 107 at ¶15); (Doc. 115 at 14, ¶15).Officer Slaughter asked Patel for identification. Patel responded "no English"[5] and "India." (Doc. 107 at ¶16)[6]; (Doc. 115 at 14, ¶16); (*see also* Doc.

---

[5] The City of Madison notes that:

Officer Parker testified that before February 6, 2015, he had observed multiple subjects saying that they did not understand English, only to find out later that the subjects did understand English and had simply been refusing to cooperate. (Parker First Crim. Tr. Test. at 833-34; Parker Second Crim. Tr. Test. at 450

(Doc. 100 at ¶50). In response, Patel notes that:

The audio from the Parker video clearly demonstrates that Parker believed Patel did not speak English. [Def.Ex.20A(Parker video)/00:37-02:00] Thus, afterwards, Parker radios, "Older Indian male. Doesn't speak English." [Def.Ex.20A(Parker video)/3:55-3:57 Def.Ex.20B(Spence video)/1:52-1:54; *see also* Def.Ex.20A(Parker video)/4:25-4:27 (no English); Def.Ex.20B(Spence video)/2:23- 2:24 (no English)]

(Doc. 115 at 25).

[6] Patel is a native of the State of Gujarat, India. However, he testified that on November 8, 2013, he visited his family in the City. Patel's visit to the United States on this occasion lasted for approximately eight months. During those eight months, Patel lived with his son's wife, who only spoke English. (Doc. 100 at ¶54); (Doc. 115 at 25 ¶54). Patel testified that he again traveled to the City on or about January 29, 2015. During this visit, Patel again stayed with his son and his son's family. (Doc. 100 at ¶55); (Doc. 115 at 25 ¶55). He also testified that he understood

100 at ¶48). Officer Slaughter asked Patel again if he lived in the neighborhood. In response, Patel raised his right arm and pointed off in the distance. (Doc. 107 at ¶17); (Doc. 115 at 14, ¶17). Patel's hands can be seen moving at his midsection and by his sides on the video. (Doc. 107 at ¶18); (Doc. 115 at 14, ¶18). Patel then walked away from the officers a third time, taking nine steps away this time. He did so despite knowing that the officers had told him to stop. (Doc. 107 at ¶19); (Doc. 115 at 14, ¶19). Each time Patel walked away from the officers, his whole body turned away from them. (Doc. 107 at ¶20); (Doc. 115 at 14, ¶20).

Officer Parker testified that he then took over as the lead investigating officer for the encounter. (Doc. 100 at ¶63); (Doc. 115 at 26, ¶63). The officers then both pursued Patel, with Officer Parker saying, "Sir. Sir. Come here." (Doc. 100 at ¶64); (Doc. 115 at 26, ¶64). After Officer Parker told him to "come here," Patel stopped and turned towards the officers. (Doc. 100 at ¶65); (Doc. 115 at 26, ¶65).

The parties vigorously dispute whether Patel ever put his hands in his pockets. (*See* Doc. 100 at ¶66); (Doc. 115 at 26 ¶66).[7] There are two police dashcam videos

---

multiple English words and phrases as of February 6, 2015. (Doc. 100 at ¶56); (Doc. 115 at 25 ¶56). He testified that English is spoken by many people in Gujarat, and he acknowledged that several of the English words he recognized are commonly spoken in Gujarat. He further testified that some newspapers in Gujarat are printed in English. (Doc. 100 at ¶57); (Doc. 115 at 25 ¶57).

[7] The City's expert notes the importance of watching a suspect's hands. (Ryan Expert Report at 31-32).

in evidence. However, the Parker dashcam video is too poor-quality to ascertain with a high level of certainty whether Parker's hands were in his pockets. (*See* Parker Dashcam Video at 1:00-2:16). Further, the angle of the video makes it such that the viewer cannot see totally what was going on. (*See id.*). The Spence dashcam video is higher quality than the Parker dashcam video. (*See generally* Spence Dashcam Video). However, it only shows the later part of the encounter. (*See id.* at 00:00-17:52). Further, the positioning of Officer Parker obstructs a view of Patel's hands. (*See id.* at 00:00-00:16). In short, neither video provides an indication that Patel's hands were in his pockets, but the videos do not tell the entire story because of the viewpoint limitations.

After the officers stopped Patel from walking away for the third time, Patel stopped walking, facing away from the road and toward the houses along the street. (Doc. 100 at ¶67); (Doc. 115 at 26, ¶67). Officer Slaughter asked whether Patel had been looking at houses, but got no response. (Doc. 100 at ¶68); (Doc. 115 at 26, ¶68).

Since Officer Slaughter, a police officer trainee, permitted Patel to continue to walk away from them, Officer Parker took over the investigatory stop. (Doc. 107 at ¶21); (*See* Doc. 115 at ¶21). The parties dispute the relative size difference between Patel and Officer Parker. (*See* Doc. 107 at ¶22); (Doc. 115 at ¶22). There is evidence from hospital records that Patel weighed around 115 pounds. (Doc. 116-2 at 1).

Parker described himself as weighing around 150 pounds. (Parker Depo. at 88:23 to 89:1-4).

The parties dispute whether Patel was acting suspiciously. (Doc. 107 at ¶23); (Doc. 115 at 15 ¶23). Officer Parker was concerned that Patel was armed. (*See* Doc. 107 at ¶23).[8] Officer Parker decided to conduct a pat-down of Patel to determine whether he was armed. (Doc. 100 at ¶89); (Doc. 115 at 30 ¶89). Officer Parker walked around Patel, stopping when he was behind Patel's left shoulder. (Doc. 100 at ¶90); (Doc. 115 at 30 ¶90). Officer Parker took hold of Patel and placed Patel's hands in a reverse prayer position, with Patel's knuckles touching each other and his palms facing out. Officer Parker held onto Patel's index fingers with his right hand. (Doc. 107 at ¶24); (Doc. 115 at 15, ¶24); (*see also* Doc. 100 at ¶91-92). Officer Slaughter then began patting down Patel's right leg. (Doc. 100 at ¶93); (Doc. 115 at 31 ¶93).

The parties vigorously dispute the actual events directly leading up to the takedown. Again, the Court notes that while there is a dashcam video, that video is not the end-all be-all of this case. There is much that the video does not show the viewer because of the video quality and the vantage point.

Officer Parker claims that Patel jerked his left hand free while he was

---

[8] Whether that belief was objectively reasonable is a different question.

beginning to perform the patdown. (Doc. 107 at ¶ 26). Patel disputes this fact. (Doc. 115 at 17 ¶ 26); (*see also* Patel Depo. at 60-61); (*but cf.* Patel Depo. at 106-07) (not remembering if there was a "tiny bit" of movement). The parties agree that Officer Parker told Patel to stop jerking away. (Doc. 107 at ¶26); (Doc. 115 at 17 ¶28). Officer Parker also warned Patel that he would put him on the ground if he kept jerking. (Doc. 100 at ¶98); (Doc. 115 at 32 ¶98). However, the parties disagree whether Patel was actually "jerking" away. (Doc. 107 at ¶26-28); (Doc. 115 at 16¶26). The parties dispute whether Patel's hand ever came free during the patdown. (Doc. 100 at ¶99); (Doc. 115 at 32 ¶99). The Court has viewed the dash cam videos and notes that they provide scant evidence that Patel moved during the patdown. (*See* Parker Dashcam Video at 00:00-02:19). For example, when Officer Parker tells Patel to stop jerking away the first time, there is virtually no movement that can be seen from his dash cam video. (*See id.* at 01:59). That does not mean there was no movement, because the video does not tell all. There is some visible evidence of movement right before the takedown, as Patel turned his head and moved his left foot. (*See id.* at 02:00-02:20); (*see also* Spence Dashcam Video at 00:00-00:17).

At some point, Officer Parker took Patel to the ground. (Doc. 100 at ¶123); (Doc. 115 at 37 ¶ 123). Despite Officer Parker's never having been taught how to perform a leg sweep, it appears that is what he attempted to do. (Doc. 100 at ¶ 117)

(citing Parker Depo. at 25, 37-38);[9] (Doc. 115 at 36 ¶ 117). Patel landed on the grass,[10] and Officer Parker landed on top of him. (Doc. 100 at ¶ 126); (Doc. 115 at 39 ¶126).

Officer Parker immediately radioed for a supervisor to come to the scene. The officers noticed Patel's nose was bleeding, and Officer Parker radioed for paramedics as well. (Doc. 107 at ¶ 33); (Doc. 115 at 18, ¶33). The video evidence shows one of the officers putting a shoe back on Patel's foot after the takedown. (Spence Dashcam Video at 01:00-01:22). Over the next several minutes, Officer Parker and the other officers on the scene attempted to help Patel stand up. (Doc. 100 at ¶ 34); (Doc. 115 at 41 ¶134). Officer Parker contends that Patel continued to resist being handcuffed, even after the takedown. (Doc. 107 at ¶32). The video does not support that claim. (Spence Dashcam Video at 00:20-00:47); (*see also* Doc. 115 at 18 ¶32).

Later, Officer Parker removed Patel's handcuffs. (Doc. 115 at ¶135); (Doc. 115 at 41 ¶135). Officer Parker spoke to both Officer Spence and Corporal Clint Harrell, the supervisor who responded. He confirmed with both that Patel continued to jerk

---

[9]  Officer Parker stated: "I know what a leg sweep is, but I don't know how to perform one. I've never been trained on one." (Parker Depo. at 25).

[10] Officer Parker testified that he tried to make sure they landed in the grass, not on the sidewalk. (Parker Deposition at 348:17 to 349:1).

away from him during the patdown.[11] (Doc. 107 at ¶34); (Doc. 115 at 18, ¶34). Patel was transported to Madison Hospital by ambulance, where he was initially treated. (Doc. 107 at ¶35); (Doc. 115 at 18, ¶35); (Doc. 100 at ¶136).

Unknown to Officer Parker at the time, Patel suffered from pre-existing severe multilevel degenerative conditions of the spine, including cervical spinal canal stenosis attributed to disc bulging, hypertrophy of the ligamentum flavum, and, acutely, to spinal cord edema at one section of his spine. This level of stenosis, though not outwardly apparent, was unusually high compared to what one would expect to find in an average man of his age. This preexisting condition predisposed Patel to spinal injury. (Doc. 100 at ¶ 129); (Doc. 115 at 40 ¶ 129).[12]

## III. STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 2265 (1986) ("[S]ummary

---

[11] Obviously, Patel disagrees with Officer Parker's characterization of what happened. (Doc. 115 at 18, ¶34).

[12] There is some evidence that Patel would have suffered a similar injury if he had fallen in a hinged manner. *See* (Mkandawire Depo at 147:4 to 147:18); (Doc. 100 at ¶130).

judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings in answering the movant.[13] *Id.* at 324, 106 S. Ct. at 2553. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d. 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). Only disputes over facts that might

---

[13] When *Celotex* was decided Fed. R. Civ. P. 56(e) encompassed this express requirement, but now this concept is covered by the language provided for under Fed. R. Civ. P. 56(c).

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249, 106 S. Ct. at 2511.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16.

First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183, 135 L. Ed. 2d 606 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955) ("Both parties filed and argued motions for summary judgment, but this does not warrant the granting of either motion if the record reflects

a genuine issue of fact.").[14]  "When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *D & H Therapy Associates, LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011); *see also, Byce v. Pruco Life Ins. Co.*, 1:09-CV-1912-RWS, 2011 WL 233390 (N.D. Ga. Jan. 21, 2011) ("[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law'") (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 538–39 (5th Cir.2004)).

The court will consider each motion independently, and in accordance with the Rule 56 standard. *See U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." WRIGHT, MILLER & KANE,

---

[14]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

FED. PRACTICE & PROC. § 2720, at 327-28 (3d ed. 1998).

### B. Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). As the Eleventh Circuit has explained the Rule 12(c) standard:

> Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts. *See Bankers Ins. Co. v. Florida Residential Property and Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998) (citing *Hebert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990)); *see also* Rule 12(c), Fed. R. Civ. P. When we review a judgment on the pleadings, therefore, we accept the facts in the complaint as true and we view them in the light most favorable to the nonmoving party. *See Ortega*, 85 F.3d at 1524 (citing *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54, 57 (5th Cir. 1978)). The complaint may not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Slagle*, 102 F.3d at 497 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S. Ct. 99, 101–02, 2 L. Ed. 2d 80 (1957) & citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811, 113 S. Ct. 2891, 2916–17, 125 L. Ed. 2d 612 (1993)).

*Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

Further, "[w]hether the court examine[s] [a pleading] under Rule 12(b)(6) or Rule 12(c), the question [remains] the same: whether the [complaint] stated a claim for relief." *Sampson v. Washington Mut. Bank*, 453 F. App'x 863, 865 n.2 (11th Cir.

2011) (first alteration supplied; all other alterations in original) (quoting *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.,* 305 F.3d 1293, 1295 n.8 (11th Cir. 2002)); *Sampson*, 453 F. App'x at 865 n.2 (applying *Strategic Income* and concluding that court's error in granting a dismissal under Rule 12(c) instead of Rule 12(b)(6) was harmless).

## IV. ANALYSIS

### A. Officer Parker's Motion for Summary Judgment Is Due To Be Granted in Part and Otherwise Denied.

#### i. Qualified Immunity

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Id*. at 1234 (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity,

would have fallen with[in] his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function–that is, pursuing his job-related goals–in an authorized manner." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001), *modified in application by Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 813, 172 L. Ed. 2d 565 (2009) (holding that "*Saucier* procedure should not be regarded as an inflexible requirement"). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct.

at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[15] *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' <u>at the time</u> it was taken[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583

---

[15] Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this case. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

(2004) ("If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818, in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity

protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991). Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did. *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096.

### 1.    Seizure[16]

First, Officer Parker argues that there was reasonable suspicion to stop Patel and that the Court should determine the question as a matter of law. (*See* Doc. 107 at 15).

"It is only when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2006) (citing other sources). The Eleventh Circuit has further explained the principles behind a *Terry* stop:

> To have reasonable suspicion, an officer conducting a stop must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *United States v. Powell*, 222 F.3d 913, 917 (11th Cir.2000) "The 'reasonable suspicion' must be more than 'an inchoate and

---

[16] It appears that whether Officer Parker was acting withing his discretionary status is not contested by the parties. (Doc. 107 at 29 n.10); (*see generally* Doc. 115) (focusing on the clearly established prong of the qualified immunity analysis).

unparticularized suspicion or hunch.' " Id. (quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570 (2000). Also, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir.2000), even if such activity is "seemingly innocuous to the ordinary citizen." *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir.2000).

We examine "the totality of the circumstances" to determine whether the police had "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citation and internal quotation marks omitted). We also recognize that the police may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 750–51 (citation and internal quotation marks omitted). To have reasonable suspicion based on an anonymous tip, the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 120 S.Ct. at 1379. "The issue is whether the tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 2414, 110 L.Ed.2d 301 (1990).

*U.S. v. Lindsey*, 482 F.3d 1285, 1290-91 (11th Cir. 2007).

This series of events started with a phone call from a concerned citizen, Jacob Maples. He called the Madison emergency services, said that Patel was wandering around people's driveways, said that he was worried about leaving his family at home, noted that he had not seen Patel until recently, described Patel's physical

appearance, gave his name, gave his phone number, and said generally where he lived. (*See* Jacob Maples 911 Call at 00:00-02:21). It is significant that Maples identified himself. *See U.S. v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006) (citing *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir.1985)) ("The courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources."). The police were dispatched to the scene and found a man substantially matching the known informant's description, and in the general area that the known informant said he would be in. Even though Officer Parker did not witness immediately apparent suspicious activity (i.e. looking at people's garages), the known informant did. *Adams v. Williams*, 407 U.S. 143, 148 (1972) ("[W]e reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability."). Further, Patel has not adequately disputed the evidence that the area in which Patel was in was known for burglaries. This too would play into what a reasonable officer would consider in determining reasonable suspicion. Here the Court finds that this is enough to provide

at least arguable reasonable suspicion[17] to make the initial (*Terry*) stop. For that reason, Officer Parker is entitled to qualified immunity on this claim.[18]

Further, "[t]he principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 187 (2004) (noting that "[a] state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures"). "The reasonableness of a seizure under the Fourth Amendment is determined 'by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" *See id.* at 187-188 (citing *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). Under Alabama law, police officers can demand answers to certain questions. *See*

---

[17] *See Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop.") (citing *Williamson v. Mills*, 65 F.3d 155, 157 (11th Cir.1995); *Swint v. The City of Wadley, Alabama*, 51 F.3d 988, 996 (11th Cir.1995); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558 (11th Cir.1993)).

[18] Patel cites to an internal report from the City of Madison that concluded that "there was no reasonable and articulable suspicion that Mr. Patel was committing or had committed or was about to commit a felony or other public offense." (*See* Doc. 115 at 63) (citing Doc. 116-3 at 20). However, the legal conclusions of an internal report do not affect the independent analysis of the Court.

Ala. Code § 15-5-30.[19]

Patel argues that any reasonable suspicion evaporated when the police got to the scene. (*See* Doc. 115 at 58). However, Officer Parker arguably had reasonable suspicion to start the *Terry* stop, and the reasonable suspicion did not go away because the officers did not obtain basic answers under Alabama law and because Patel attempted to walk away several times.[20] Accordingly, the Court **GRANTS** Officer Parker **QUALIFIED IMMUNITY** on the *Terry* seizure claim.

## 2. Search

Second, Officer Parker argues that there was "reasonable, articulable suspicion that [Patel] was armed and dangerous." (*See* Doc. 107 at 15). For that reason, Officer Parker believes that Patel has no "unlawful search" claim. (*See id.* at 23).

As an initial matter, the Court has to determine what Patel pled in his unlawful

---

[19] The statute states:

> A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he **reasonably suspects** is committing, has committed or **is about to commit a felony or other public offense** and **may demand** of him **his name, address and an explanation of his actions.**

Ala. Code § 15-5-30 (emphasis added).

[20] The Court also notes that the time before the takedown was relatively short – about a minute and thirty seconds. (Parker Dashcam Video 00:50-2:20).

search claim. The facts of the Complaint lead the Court to infer that the focus of the unlawful search claim was the *Terry* frisk. (Doc. 58 at ¶ 17, 18, 33). The Complaint did not allege that Officer Parker took actions (i.e. going inside Patel's pockets) that would take this from a *Terry* frisk that requires a fear that the suspect is armed and dangerous, to a search requiring probable cause. (*See id.*). Further, Officer Parker moved for summary judgment on the search claim (Doc. 107 at 15-23). In response, Patel talks only about a *Terry* frisk aspect. (*See* Doc. 115 at 55-60). Patel references Officer Parker going inside his pockets in the section alleging false arrest. (*See* Doc. 115 at 72). For that reason, the Court reads Patel to be arguing that when Officer Parker emptied Patel's pockets, this is a factor to be considered regarding the illegal seizure. The Court further determines that any claim that Officer Parker illegally searched Patel via emptying his pockets was abandoned as insufficiently argued. "The parties bear the burden of formulating arguments before the district court, and 'grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned' and will not be considered on appeal." *Bracklin v. Anson*, 585 F. App'x 991, 994 (11th Cir. 2014) (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598-99 (11th Cir. 1995))

The issue here is qualified immunity, and the Court must determine whether Officer Parker's patdown violated clearly established law. In other words, Officer

Parker must have had at least arguable reasonable suspicion that Patel was armed and dangerous. *Cf. Jackson*, 206 F.3d at 1166. Whether this suspicion existed in fact is a question for the jury; however, qualified immunity is a question of law for the Court, and the Court can determine that the question is at least arguable under the undisputed facts, taken in the light most favorable to Patel.

The general principles surrounding a *Terry* frisk are well known:

> In connection with a *Terry* stop, an officer may conduct a pat-down search if he has reason to believe that his own safety or the safety of others is at risk. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. "The officer need not be *absolutely certain* that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (emphasis added).

*U.S. v. White*, 593 F.3d 1199, 1202-03 (11th Cir. 2010); *see also U.S. v. Griffin*, 696 F.3d 1354, 1359 (11th Cir. 2012) (citing *White*, 593 F.3d at 1202) ("Once an officer has stopped an individual, he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety, or the safety of others, is threatened."). "*Terry* does not demand definitive evidence of a weapon or absolute certainty that an individual is armed." *Griffin*, 696 F.3d at 1359. The Court views the "totality of the circumstances, and [does] not consider each fact in isolation." *See id*. (citing *U.S. v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)).

Viewing the facts in the light most favorable to Patel, the Court finds that

Officer Parker was arguably warranted in his belief, even though later shown to be erroneous, that Patel could have been armed. In the previous section, the Court discussed how Officer Parker had arguable reasonable suspicion to believe that a burglary could have been either in progress, or that Patel was casing a home to burglarize it.[21] That is significant to the frisk analysis. *See U.S. v. Matchett*, 802 F.3d 1185, 1192-93 (11th Cir. 2015) (taking into account the nature of the suspected offense). "[B]urglary is the type of offense 'normally and reasonably expected to involve a weapon.'" *U.S. v. Snow*, 656 F.3d 498, 501 (11th Cir. 2011) (citing *U.S. v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007)); *see also Griffin*, 696 F.3d at 1360.[22] "[A] suspect's 'cordiality' and 'cooperativeness' upon being stopped for questioning do not undermine the possibility that he might be armed." *Snow*, 656 F.3d at 501.

Given that Officer Parker had arguable reasonable suspicion to stop Patel, the nature of the potential offense was a burglary, the neighborhood had a history of burglaries, the time of day was that in which a burglary could be expected, Patel

---

[21] It turns out that Patel was innocently walking along the sidewalk in the morning – not casing homes to burglarize. However, this Court must focus upon what Officer Parker knew at the time he frisked Patel, not what was determined to be true later.

[22] The Court is cognizant that the Eleventh Circuit in *Griffin* did not adopt a categorical rule that the nature of the offense is enough, alone, to justify a *Terry* frisk. *See Griffin*, 696 F.3d at 1359-60 ("We need not decide today whether to adopt such a categorical *Terry* rule."). The opinion the Court issues today need not, and does not, adopt that categorical rule either. Viewing the totality of the circumstances as they developed during the stop, Officer Parker had arguably reasonable, even if later proven erroneous, grounds to frisk Patel.

walked away from the officers three times, and Patel never fully answered the officer's questions, this is enough for Officer Parker to take the arguably reasonable step of patting Patel down to check for the presence of a weapon that could hurt him or his fellow officer. Patel has not identified any cases that are sufficiently analogous to lead the Court to the conclusion that this was not at least an arguable question, even if wrong in the end.

Accordingly, the Court **GRANTS** Officer Parker **QUALIFIED IMMUNITY** on the *Terry* search claim.

### 3. Excessive Force

Third, Officer Parker argues that "the force used against [Patel] was objectively reasonable." (*See* Doc. 107 at 15). Here, the Court will first determine whether there is a constitutional violation. Second, the Court will then discuss the qualified immunity aspect of this claim. This excessive force claim is not subsumed by the seizure claim because the Court is granting Officer Parker qualified immunity on that claim. In other words, whether "the officer used excessive force must be analyzed independently." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Jackson v. Sauls*, 205 F.3d 1156, 1171 (11th Cir. 2000)).

As an initial matter, the Court will explain the relevant law surrounding the use of excessive force. The Eleventh Circuit spoke to the matter in *Draper*:

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)). A court looks to the "totality of circumstances" to determine whether the manner of arrest was reasonable. *See Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985). "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Lee, 284 F.3d at 1198 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir.1986)); *see also Vinyard*, 311 F.3d at 1347. It is well settled that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871–72; *Vinyard*, 311 F.3d at 1347; *Lee*, 284 F.3d at 1197. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872.

*Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (internal footnote omitted). Further, "the need for the application of force is measured by this test: 'the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.'" *See id.* at 1277 n.13 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

This Court is also cognizant of the special interests at stake in excessive force claims:

In making an excessive force inquiry, <u>we are not to view the matter as judges from the comfort and safety of our chambers</u>, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. <u>We must see the situation through the eyes of the officer on the scene</u> who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.

*Crosby v. Monroe County*, 394 F.3d 1328, 1333-34 (11th Cir. 2004) (citing other sources) (emphasis added).

For the reasons to be stated, the Court finds that there are disputed issues of material fact that prevent summary judgment as to whether Officer Parker used excessive force on Patel. First, there is a disputed issue of material fact whether Patel ever resisted Officer Parker. (Doc. 107 at 11, ¶26) ("However, plaintiff jerked his left hand free while Officer Parker was beginning to perform the patdown."); (Doc. 115 at 16, ¶26) ("Disputed that Patel ever jerked away from Parker and disputed that Parker ever lost control of Patel's hands."); (*see also* Doc. 115 at 16-17, ¶28). Part of this dispute revolves around whether Officer Parker was lying when he indicated, on video, that Patel was resisting. (*See* Doc. 115 at 17, ¶28) ("Admitted that Parker made false claims on the video to cover his wrongful intentions.").[23] Just because there is

---

[23] This is more of Patel's gloss on the case. Officer Parker maintains that he was not lying. (Parker Brief at 11, fn. 4). The Court reads Patel's brief to admit Officer Parker to have literally verbalized the words but to dispute that those words reflected reality.

a video does not mean that summary judgment is always appropriate. Here, the video does not blatantly contradict –or support-- either party's version of events. A video does not always tell the entire story, and a reasonable person viewing the video evidence (along with the other evidence in the case) could come to different conclusions. Specifically, the video does not give a clear picture of what is going on with Patel's hands. A jury needs to decide, conclusively, whether Patel resisted Officer Parker.

Second, it is disputed whether Officer Parker was able to complete the patdown of Patel. (Doc. 107 at 11, ¶27) ("Officer Parker could not verify whether plaintiff had a weapon in his front left pocket, as he was unable to complete the patdown.") (citing Ex. B, Parker Dep., 168:14-21; Ex. K, Tab 7, First Trial Transcript, 838:25–839:1); (Doc. 115 at 16, ¶27) ("Disputed that Parker was unable to complete a patdown of Parker's front left pocket.") (citing Patel's response in paragraph 26).

Third, it is disputed whether Officer Parker was able to restrain Patel before executing the takedown. (Parker Brief at 13, ¶32) ("Only after plaintiff was taken to the ground was Officer Parker able to [begin] to place plaintiff in handcuffs.") (citing Ex. B, Parker Dep., 218:10-20); (Patel Response at 18, ¶32) ("Disputed. Parker's claim that he could not handcuff Patel because Patel was jerking away is directly contradicted by the video and by Patel.") (citing the videos and Patel's deposition).

Whether Patel put up any resistance is a crucial question for summary judgment, and the facts are clearly disputed. Both parties at different times point to the video to support their own version of events. Where the video is inconclusive, they use other evidence to buttress their story. This is not an open and shut factual case.[24] A jury could see the evidence in this case and totally believe Patel's version that he was not resisting Officer Parker and that any force was excessive. Conversely, a jury could find that Patel did resist but the force was still excessive. Finally, a jury could believe that Patel resisted and that the force used was not excessive.[25]

Having determined that there are disputed issues of material fact preventing this Court from concluding whether there was a constitutional violation, this Court now considers whether Officer Parker is entitled to qualified immunity. The Court determines that he is not.

Viewing the evidence in the light most favorable to the non-movant, Patel,[26] Officer Parker violated Patel's clearly established rights not to be subjected to

---

[24]   For what it is worth, Officer Parker had two criminal jury trials that ended in a hung jury. While the criminal trials were obviously very different from the instant case in many ways, it does show that reasonable minds can differ on this evidence.

[25] Essentially, the facts, viewed in the light most favorable to Patel, show a constitutional violation. Those same facts, viewed in the list most favorable to Officer Parker (which the Court must do on Patel's motion for summary judgment), show there is no constitutional violation.

[26] *See Lee*, 284 F.3d at 1197.

excessive force during the course of a *Terry* stop. The law regarding the use of force comes from Supreme Court precedent like in *Graham v. Connor*. To the extent there is no directly comparable preexisting case law, this is an obvious clarity case, looking at the Fourth Amendment and relevant case law. *See Vinyard*, 311 F.3d at 1350-51. Under the version of facts favorable to Patel, he was not mounting any resistance to Officer Parker. This is one of those obvious instances where, if a suspect is not resisting the officer,[27] then using a leg sweep maneuver to take him down (especially when the Officer had no prior training on such force) is clearly prohibited. The "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008); *see also Stephens v. DeGiovanni*, 852 F.3d 1298, 1327-28 (11th Cir. 2017) (noting that this was an "obvious-clarity" case that did not require "'particularized preexisting case law'") (citing another source); *see also Saunders v. Duke*, 766 F.3d 1262, 1264 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.") (citing sources).

---

[27] The facts, taken in the light most favorable to Patel, do not show anything more than minor movement. Of course, the facts adduced at trial might show a different story. At summary judgment, the Court does not make credibility determinations.

Officer Parker cites to several cases about the use of force on unhandcuffed individuals. (*See* Doc. 107 at 36). However, they fail to persuade the Court because they involved *de minimus* force, while the force used here was not. *See Gomez v. U.S.*, 601 F. App'x 841, 850 (11th Cir. 2015); *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000); *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1460-61 (11th Cir. 1997); *Tarpley v. Miami-Dade County*, 212 F. Supp. 3d 1273, 1282-84 (S.D. Fla. 2016).[28] The leg sweep used here rendered Patel partially paralyzed. In other words, using a leg sweep maneuver without any prior training on an unresisting suspect during the course of a patdown is unreasonable. This was not the use of *de minimus* force, and that matters. *Cf. Stephens v. DeGiovanni*, 852 F.3d 1298, 1326-27 (11th Cir. 2017). For those reasons, Officer Parker is not entitled to qualified immunity at this time.[29] Accordingly, Officer Parker's motion for summary judgment on the

---

[28] The Court notes that, even though Patel might have been unhandcuffed, there is obviously a limit to what sort of force the police can use. It is not a no-holds barred situation until the handcuffs are put on. There are obvious limits that are fact dependent. Using a leg sweep maneuver without any prior training on an elderly suspect that moves minimally, or not at all (under Patel's facts), is beyond the permissible limit.

[29] This opinion is not saying that Officer Parker will never be entitled to qualified immunity– far from it. "Defendants who are not successful with their qualified immunity defense before trial can re-assert it at the end of the plaintiff's case in a Rule 50(a) motion." *See Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) (citing FED. R. CIV. P. 50(a); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996). The Court will reevaluate qualified immunity at that time. *See id.* at 1318 (citing *Abel v. Dubberly*, 210 F.3d 1334 (11th Cir. 2000)) ("Where there is no change in the evidence, the same evidentiary dispute that got the plaintiff past a summary judgment motion asserting the qualified immunity defense will usually get that plaintiff past a Rule 50(a) motion asserting the defense, although the district court is free to change its

excessive force claim is **DENIED**.

> ## ii.     State Law Claims

Parker also moves for summary judgment on the state law claims. (*See* Doc. 107 at 37). They were brought against Officer Parker only. (*See* Doc. 58 at 15-16). Those claims are for illegal search, false arrest, and excessive force. (*See id.*).

In addition to claiming that he has not substantively violated Alabama law, Officer Parker also believes he is entitled to state agent immunity. State agent immunity is codified in Alabama:

> (a) Every peace officer . . . shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a) (1975). "Simply stated, the statute shields every defendant who (1) is a "peace officer," (2) is performing "law enforcement duties," and (3) is exercising judgment or discretion." *Howard v. City of Atmore*, 887 So.2d 201, 204 (Ala. 2003). There are two exceptions to this immunity:

> Notwithstanding anything to the contrary in the foregoing

---

mind.").

Ultimately, this Court will be the one to decide qualified immunity. *See id.* (citing *Stone v. Peacock*, 968 F.2d 1163, 1166 (11th Cir. 1992); *Ansley v. Heinrich*, 925 F.2d 1139, 1348 (11th Cir. 1991)) ("When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty.").

statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 2d 293, 405 (Ala. 2000). Patel "bears the burden of establishing this exception." *Stephens v. City of Butler, Ala.*, 509 F. Supp. 2d 1098, 1115 (S.D. Ala. 2007) (citing *Howard v. City of Atmore*, 887 So. 2d 201, 205 (Ala. 2003)).

### 1.    False Arrest[30] and Unlawful Search

Above, the Court concluded that Officer Parker was entitled to qualified immunity on Patel's § 1983 search and seizure claims. The Court reached that conclusion because Officer Parker had at least an *arguable* reasonable suspicion to stop Patel and at least an *arguable* reasonable suspicion that Patel was armed and dangerous. That same logic applies here as well. *See Brown v. City of Huntsville,*

---

[30] Count V for false arrest discusses "probable cause." (Doc. 58 at 15-16). Officer Parker's brief writes to this claim as if it alleged a reasonable suspicion issue, which arguably expands the breadth of what Patel pled. (*See* Doc. 107 at 34-35). In other words, Officer Parker may have given Patel more credit than he was due on this claim. Nevertheless, the Court went ahead and analyzed this false arrest claim under a reasonable suspicion analysis here, and proceeds to discuss the false arrest aspect later on in Section D of this opinion.

*Ala.*, 608 F.3d 724, 741 (11th Cir. 2010). Further, the Court sees no evidence of willfulness or malice in the *Terry* stop or frisk. For that reason, the Court **GRANTS** Officer Parker state agent immunity for Patel's state law false arrest and unlawful search claims (Counts IV and V).

### 2.    Assault and Battery

In Alabama, "'[a]ssault' has been defined as 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Wood v. Cowart Enterprises, Inc.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001) (quoting *Western Union Tel. Co. v. Hill*, 25 Ala. App. 540, 542, 150 So. 709, 710 (1933)) (emphasis omitted). Additionally, " the elements of battery are: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Id.* (citing *Ex parte Atmore Cmty. Hosp.*, 719 So.2d 1190 (Ala.1998)) (emphasis omitted).

The Court's analysis of the excessive force claim in the §1983 context is useful here as well. Patel has met his burden of producing evidence that Officer Parker committed an assault and battery by his use of force. A reasonable jury could very

well find that the takedown used by Officer Parker was entirely unnecessary, viewing the totality of the circumstances. However, the Court must also consider state agent immunity.

The Court finds that state agent immunity is inappropriate at this time. In this case, "the evidence taken in the light most favorable to the plaintiff supports a finding that [the officer] applied significantly more force than was arguably warranted by the circumstances, causing plaintiff significant injury." *Stephens*, 509 F. Supp. 2d at 1116. Under Patel's version of the facts, Officer Parker's paralyzing leg sweep takedown "was done intentionally, gratuitously, and in violation of [the plaintiff's] clearly established constitutional rights." *See Brown*, 608 F.3d at 742. Also, Officer Parker admittedly attempted the maneuver without any prior training. In conclusion, the Court **DENIES** Officer Parker state agent immunity for Patel's assault and battery claim.

## B.     The City's Motion Is Due To Be Denied.

### i.     Motion To Strike

In a footnote in his reply, Officer Parker asks the Court to strike Patel's response because it allegedly fails to comply with this Court's Uniform Initial Order. (Doc. 127 at 4 n. 2).[31] While the Court notes that Patel should have sought leave to

---

[31] The Court granted leave to file excess pages. (Doc. 94).

consolidate his brief and exceed the page limit, the Court also acknowledges that Patel's filing of a consolidated brief helped the Court to decide these issues, given the importance, complexity, and extensive briefing. The Court notes that by filing one 85 page brief, Patel spared the Court from having to read two 60 page briefs – that was helpful to judicial economy. Accordingly, the footnote asking the Court to strike Patel's brief is **DENIED**.

### ii.     Motion for Judgment on the Pleadings

The City filed a Motion For Judgment on the Pleadings, along with its Motion For Summary Judgment. (Doc. 99); (Doc. 100 at 43).The City argues that "[b]ecause [Mr. Patel's] complaint alleges no plausible basis for a standing policy or custom of engaging in *excessive force*, the City is entitled to judgment on the pleadings as to Count III." (*See* Doc. 128 at 33). That is because "the allegations that the Court found sufficiently plausible to support this theory only involve the City's practices with respect to stop and frisk encounters, not its alleged tolerance of excessive force." (Doc. 100 at 46) (emphasis omitted).

Patel, in response, argues that "[he] does not read the Court's order as the City does." (Doc. 115 at 93). He additionally incorporated his January 4, 2017, response to the Motion To Dismiss. (*Id.*).

Here, Count III states, in relevant part:

83.   <u>The City's policies and customs</u>, including those regarding investigations of citizen complaints and tolerance for constitutional violations in general, were the moving force behind Parker's violation of Patel's Fourth Amendment rights.

(Fourth Amended Complaint at 15) (emphasis added).

This Court best understands its own ruling from February 1, 2017. In that Memorandum Opinion and Order, this Court stated:

Therefore, persuasively guided by *Haley* and *Hoefling* (which comparably involved the plausibility of facts reflecting a standing municipal policy to seize and destroy boats without prior notice to the owners), the court finds that <u>Mr. Patel has plausibly asserted the existence of a standing policy or custom attributable to the City through the Madison Police Department</u> that is distinct from his failure-to-train theory and that, if proven, could support Mr. Patel's constitutional claims asserted against the City. Thus, to that extent, the Motion is **DENIED**.

(Doc. 65 at 24) (emphasis added). This Court also stated the following about the standing policy and custom allegations:

Further, the court agrees that Mr. Patel's Fourth Amended Complaint includes standing policy and custom allegations that are separate from and analyzed differently than his failure-to-train ones. (*See*, *e.g.*, Doc. 58 at 7 ¶ ("[T]he City evaluated officers' performance based in part on their statistics for 'self initiated' contacts, arrests, and tickets, thereby encouraging officers to be aggressive in their approaches to allegedly suspicious persons."); *id.* ¶ 43 ("Officers were encouraged to make stops without also being reminded of the limits on their authority to make them."); *id.* at 8 ¶ 44 ("[P]olice officers were specifically trained that patdowns for weapons were permitted, in the officer's complete discretion, during any investigatory stop."); *id.* ¶ 47 ("Academy training, however, is followed by a 16-week training program in which FTOs

teach new officers how the job is really done.) (emphasis added); *id.* ¶ 48 ("In treating [Mr.] Patel as he did, [Officer] Parker, the FTO, was teaching the trainee with him about how the job of a Madison police officer is really done."); *id.* ¶ 49 ("Thus, multiple FTOs testified in [Officer] Parker's criminal trials that [Officer] Parker's actions were consistent with Madison policy and training.")).

(Doc. 65 at 23-24) (internal footnote omitted).

There is no eminently obvious reason why these allegations are not applicable to the excessive force claim, as the City of Madison implies. (*See* Doc. 100 at 46). Rather, it takes less mental gymnastics to accept that when Mr. Patel talks about "how the job is really done" or what Officer Parker's actions are, those statements clearly relate to the crux of this case: Officer Parker's supposedly excessively forceful takedown. The Court finds that the Fourth Amended Complaint adequately pleads the standing policy and custom theory, as it would apply to Count III excessive force. The Court will not require more of Patel at the pleading stage. This logic was explained in its Memorandum Opinion and Order from February 1, 2017. That Memorandum Opinion and Order already dealt with the City's attempt to "dismiss all claims against it." (Doc. 60 at 2). The Court sees no need to extensively revisit this subject. Accordingly, the Motion for Judgment on the Pleadings is **DENIED**.

### iii.    Motion for Summary Judgment

The City moved for summary judgment. (Doc. 100). However, this Court

previously entered a bifurcation order that suspended discovery related to the liability of the City[32] pending the outcome of these dispositive motions. (Doc. 71 at 2). For that reason, *Monell* is not an issue at summary judgment here. Instead, even though Officer Parker is entitled to qualified immunity, the Court addresses whether there are triable constitutional questions regarding the City <u>without</u> factoring in a *Monell* defense.[33] For the reasons stated below, there are.

---

[32] The Eleventh Circuit has noted that:

> A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Municipal policy or custom may include a failure to provide adequate training if the deficiency "evidences a deliberate indifference to the rights of its inhabitants." *Id.* at 388, 109 S.[ ]Ct. 1197. To establish a city's deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.1998). A city may be put on notice in two ways. First, if the city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent. *Id.* at 1351. Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious. *Id.* at 1351–52.

*Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009).

[33] A "municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen v. City of Independence, Mo.*, 445 U.S. 622, 638 (1980); *see also Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990) ("[M]unicipalities are not entitled to absolute or qualified immunity.") (citing *Owen*, 445 U.S. at 638; *Monell*, 436 U.S. at 701); 15 Am. Jur. 2d Civil Rights § 113 (2018) ("The defense of qualified immunity is not available to a municipal corporation.") (citation footnote omitted); *id.* ("[A]lthough a municipal officer who violates a federal statutory or constitutional right may escape liability under 42 U.S.C.A. § 1983 by virtue of qualified immunity, a plaintiff who can prove that the officer acted pursuant to an official policy of the municipality may recover from the municipality,

## 1.    Seizure and Search

The City of Madison moves for summary judgment on Counts I and II. (*See* Doc. 100 at 32). The City argues that "Officer Parker relied on multiple articulable–and undisputed–facts." (*See id.* at 33). They cite the known informant's telephone call, the informant's knowledge of the neighborhood, the neighborhood's rate of burglaries, and Officer Parker's corroboration of the informant's facts. (*See id.* at 33-36). The City also notes how burglaries often happen in the day time. (*See id.* at 35).

The City also argues that Officer Parker acted reasonably in patting down Patel to check for weapons. (*See id.* at 36). The City argues that the nature of the offense–burglary – was enough by itself to justify the patdown. (*See id.* at 37).[34] Despite the potential language barrier, the City posits that Officer Parker was not wrong to disbelieve Patel's difficulties with the English language[35] and demand answers to the

---

notwithstanding that recovery from its officer is barred.") (citation footnotes omitted).

[34]  The City seems to argue that the rule in the Eleventh Circuit is that the nature of the suspected offense is enough by itself to justify a patdown. (*See* Doc. 100 at 37-38) ("[T]he fact that Officer Parker reasonably suspected that Plaintiff may have been involved in a burglary ***by itself*** provided him with sufficient reason to conduct a pat-down."). The City relies on the Eleventh Circuit in *U.S. v. Matchett*. (*See id.*) (citing *U.S. v. Matchett*, 802 F.3d 1185, 1193 (11th Cir. 2015)). However, that is not the rule. The *Matchett* court noted the rule in other circuits, but did not specifically join them. *See Matchett*, 802 F.3d at 1193. The court, instead, evaluated the "totality of the circumstances." *Id.*

[35] The City notes that Patel obeyed some commands that were given in English. (*See* Doc. 100 at 38-39).

statutory questions under Ala. Code §15-5-30. (*See id.* at 38). Finally, the City argues that Patel looked nervous and kept putting his hands in his pockets. (*See id.* at 39-42).

Patel paints a different picture, arguing that the *Terry* stop and frisk against the City should go to trial. (*See* Doc. 115 at 46-59). For the following reasons, Counts I and II will go to a jury absent a successful *Monell* challenge by the City.

A jury is needed to determine whether Officer Parker had reasonable suspicion to stop Patel. The Court will not determine this as a matter of law. The Court notes that while the 911 call came from a known informant, the police did very minimal corroboration. (*See* Doc. 115 at 58). Further, there is no evidence that the informant had previously given the police good information. The officers found an older male, lawfully walking normally along a sidewalk. (*See id.*). The video shows that he was not in anyone's yard.

Additionally, considering the totality of the circumstances taken in the light most favorable to Patel, as this Court must do on summary judgment, an officer in Parker's position would reasonably think that there was a language barrier obstructing communication, not that Patel was deviously hiding the truth. (*See id.*). The Court notes that a *Terry* stop must be "justified <u>at its inception</u>." *Terry v. Ohio*, 392 U.S. 1, 20 (1968) (emphasis added). The City discussed how Patel's actions <u>after</u> the stop occurred supplied reasonable suspicion, but the relevant inquiry is whether reasonable

suspicion existed <u>when</u> Patel was stopped.

Naturally, an understanding of when Patel was seized, as understood in the *Terry* context, is important. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19, n.16. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* "The rule looks, not to the subjective perceptions of the person questioned, but rather, to the objective characteristics of the encounter that may suggest whether a reasonable person would have felt free to leave." *California v. Hodari D.*, 499 U.S. 621, 640 (1991). Taken in the light most favorable to the Plaintiff, a reasonable person would not feel free to leave if two armed, uniformed officers approached him and commanded him to "come here" twice very early on in the encounter. (Parker Dashcam Video 00:44, 01:00). The video supplies evidence that this was not a consensual stop, and so there is a genuine issue of material fact whether reasonable suspicion existed when the police encountered Patel.

Here, it is a jury question whether that reasonable suspicion existed. Certainly, there were justifiable grounds for Officer Parker to continue to observe Patel, but depriving him of his freedom of movement is a different matter. Since the City has not shown that it is entitled to summary judgment on the seizure claim, the City is

also not entitled to summary judgment on the *Terry* frisk claim. If the *Terry* stop was not justified from the start, a reasonable jury could conclude that Officer Parker had no constitutionally-permissive basis to frisk Patel for weapons, even if he did think he was armed.[36] Accordingly, the City's motion for summary judgment on the search and seizure claims is **DENIED**.

## 2.  Excessive Force

The City moves for summary judgment on Patel's excessive force claim. (Doc. 100 at 48). However, for essentially the same rationale as why the Court denied Officer Parker qualified immunity, so will the Court deny summary judgment to the City on this claim. The Court previously discussed the disputed issues of material fact precluding summary judgment for Officer Parker. Those apply equally to the City.

The City cites several cases in support of its position. The City argues that *Croom v. Balkwill* favors summary judgment. (*See* Doc. 100 at 50) (citing *Croom v. Balkwill*, 645 F.3d at 1240 (11th Cir. 2011)). There, the court noted that "the force used against [plaintiff] was *de minimus*." *See Croom*, 645 F.3d at 1252. In that case, "[t]he force . . . at issue consist[ed] of Deputy Graham pushing [plaintiff] to the

---

[36] *See* 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.6(a) (5th ed.) ("This means that in the absence of some legitimate basis for the officer being in immediate proximity to the person, a degree of suspicion that the person is armed which would suffice to justify a frisk if there were that basis will not alone justify such a search.") (emphasis and internal footnotes omitted). There is an exception to this rule when "[reasonable] suspicion suddenly appears." *See id.*

ground from her squatting position and holding her there with a foot (or knee) in the back for up to ten minutes." *See id.* In this case, the force was far from *de minimus*. Viewed in the light most favorable to Patel, it consisted of Officer Parker using an aggressive takedown leg sweep maneuver (without having received any training) that ultimately left Patel with severe injuries. Since the Court is not persuaded that the force used here was *de minimus*, the Court is not persuaded by the *Jones* case either. (*See* Doc. 100 at 50) (citing *Jones v. City of Dothan*, 121 F.3d 1456 (11th Cir. 1997)).

The City also cites to the district court in *Walker.* (Doc. 100 at 51) (citing *Walker v. City of Huntsville, Ala.*, No. 04-S-2636-NE, Doc. 87 (N.D. Ala. June 11, 2008)); (*see also* Doc. 128 at 25-26). Unlike here, in that case the plaintiff "began 'swinging her arms around, not wanting to get out of the vehicle.'" *See Walker*, Doc. 87 at 6 (citing another source) (internal footnote omitted). In response, the officer used "a leg sweep maneuver to place her on the ground and hancuff[ ] her." (*See id.* at 6-7 (internal footnote omitted). Here, viewed in the light most favorable to Patel, he was not moving in any significant fashion. The video shows little to no movement from Patel throughout the patdown until the end, when there is some movement from Patel.[37] While a leg sweep maneuver may be an appropriate use of force at times, as

---

[37] The Court notes that the movement immediately prior to the takedown appears to be little more than Patel turning toward Officer Spence's upcoming vehicle.

the court in *Walker* noted, at other times it is grossly disproportionate to any sort of minor transgressions from a suspect who is being seized and searched. This rule of gross disproportionality would seem to apply, especially when the officer attempting the leg sweep maneuver lacks any training to execute it properly.

The City cites to Patel's hand movements to justify Officer Parker's actions. (Doc. 100 at 53). However, as explained earlier in this opinion, the videos do not supply definitive evidence of those hand movements, and the Court finds there is a genuine dispute over the extent of Patel's movements before the takedown. A jury must determine if Patel was resisting.

The City also cites to the *Tarpley* case. (Doc. 100 at 54) (citing *Tarpley v. Miami-Dade County*, 212 F. Supp. 3d 1273 (S.D. Fla. 2016)). First, this case is from another district court, and so it is not controlling authority. *See generally Tarpley*, 212 F. Supp. 3d 1273. Second, that case's discussion of the constitutional violation, as opposed to the clearly established component of qualified immunity, is limited. *See id.* at 1283-85. It is significant whether the suspect is handcuffed or not. *See id*. at 1283-84. However, that is not the end of the analysis. *Croom v. Balkwill*, 645 F.3d 1240, 1252 (11th Cir. 2011) (noting the "*de minimus*-force exception" but also noting that courts use the "Fourth Amendment's 'objective reasonableness' standard").

Alternatively, the City argues that, under the *Graham* factors, there is no triable

excessive force claim here. (*See* Doc. 100 at 55).[38] The *Graham* factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

Because reasonable minds may differ, a jury must make the factual determinations reasonably necessary to decide this issue. The facts, in the light most favorable to Patel, could support a jury verdict that Officer Parker was unreasonable in assuming a burglary was in process, that Patel posed an immediate threat, and that Patel was resisting the police. Thus, the Court finds that summary judgment in favor of the City on the basis of the *Graham* factors is inappropriate.

The City cites to two main cases in arguing that Officer Parker's use of force was reasonable. (*See* Doc. 100 at 57-58) (citing *Craft v. Genao*, No. 6:10-cv-260-Orl-22TBS, 2012 WL 129611101 (M.D. Fla. Dec. 13, 2012); *Morales v. Demings*, No. 6:15-CV-1453, 2017 WL 881856 (M.D. Fla. Mar. 6, 2017)). The City argues that this case "cannot be distinguished" factually from those cases. (*See id.* at 58). The Court

---

[38] The City notes that the City's internal affairs investigation (which is generally unfavorable to the legal positions they are now taking in the current litigation) is immaterial to the present constitutional questions. (*See* Doc. 128 at 27-28). The Court generally agrees. What an internal investigation committee believes does not control this Court's interpretation of the United States Constitution.

disagrees. Unlike in *Craft*, Patel was not fleeing from the police, carrying a bundle of clothes that could have concealed a weapon, and hiding out in the woods. *See Craft*, 2012 WL 12961101, *1-4. To the contrary, the evidence is unclear whether Patel ever went for his pockets, moved in any significant way, or resisted the search.[39] Unlike in *Morales*, Officer Parker did not have to track Patel following an actual burglary, nor find him lying in a field with his face not visible. *See Morales*, 2017 WL 881856, *1-2. A jury is needed to make the credibility determinations necessary to determine the excessive force claim.

The City argues that "the fact that extensive injuries occurred does not mean [Patel] was subjected to unconstitutionally excessive force." (*See* Doc. 100 at 59). In support, the City relies on the *Fennell* decision. (*See id.* at 59-60) (citing *Fennell v. Gilstrap*, 559 F.3d 1212 (11th Cir. 2009)). While this is true, it is not dispositive but, rather, only a factor to be considered. *See Fennell*, 559 F.3d at 1217; *Jones v. Fransen*, 857 F.3d 843, 853 (11th Cir. 2017). Further, the City does not dispute that Patel's injuries were severe. (*See* Doc. 100 at 59). The Court finds, viewed in the light most favorable to Patel, that executing a forceful leg sweep maneuver that would put someone on the ground (potentially head first) could, especially without any prior training, foreseeably lead to very severe injuries.

---

[39] This is significant. *See Stephens*, 852 F.3d at 1328.

In sum, there is enough evidence pointing to the conclusion that Officer Parker used excessive force on Patel that this matter is appropriate for the jury as to the City absent a successful *Monell* defense. Accordingly, the City's motion for summary judgment is **DENIED**.

### C.     Patel's Motion for Summary Judgment Is Due To Be Denied.

Patel moves for summary judgment on his excessive force claim. (*See* Doc. 103 at 5). For the same reasons that the Court does not grant summary judgment to the City of Madison on this count (i.e. there is a disputed issue of material fact), Patel is not entitled to summary judgment either. A reasonable jury could find that Patel did resist and, in light of that resistance, Officer Parker was justified in using force to take down Patel. Accordingly, Patel's Motion for Summary Judgment is **DENIED**.

### D.     False Arrest Theory

Throughout the City's and Officer Parker's summary judgment briefing, the issues focus on *Terry* stop, *Terry* frisk, and excessive force. (*See* Doc. 100 at 2); (Doc. 107 at 2-3). However, in his response to these motions, Patel argues that Officer Parker actually arrested Patel, not just stopped him. (*See* Doc. 115 at 69). The City argues that this is the first time a false arrest theory has come up. (*See* Doc. 128 at 28) ("[Patel] argues for the first time that Officer Parker's actions constituted an arrest without probable cause."). Officer Parker argues that Patel is trying to "*de facto*

amend his pleadings via a summary-judgment brief." (*See* Doc. 127 at 22) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

The first question the Court must ask is whether Patel actually brought a false arrest claim in his Fourth Amended Complaint. In the Eleventh Circuit, "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour*, 382 F.3d at 1315 (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996)).

Count I of the Fourth Amended Complaint is relevant but poorly drafted. (*See* Doc. 58 at 13). It states that it is for "[i]llegal [s]eizure." (*See id.* at 13). It goes on to allege that "Parker . . . seized Patel without reasonable suspicion or probable cause." (*See id.* at ¶73). Obviously, probable cause is a concept that is important to arrests. Notably, Patel never alleges in his fact section that Officer Parker actually arrested him. (*See id.* at 1-12). He does claim that the "stop was without reasonable suspicion or probable cause." (*See id.* at 3 ¶14). The closest he gets to claiming he was arrested was when he alleged that "Parker cuffed Patel, as it was Parker's <u>intention</u> to arrest Patel, though ultimately no charges were filed." (*Id.* at 3 ¶22) (emphasis added). Count I is poorly drafted. It should have been brought in two separate, clear counts.[40]

---

[40] For example, Patel's Count V is plainly for "false arrest/false imprisonment" under state law. (See Doc. 58 at 15-16) (emphasis and capitalization omitted). The words "false arrest" are right there.

However, at this stage the Court will not dismiss a theory that appears, albeit inartfully, on the face of Patel's pleadings.

Even still, the Defendants are entitled to summary judgment because no reasonable jury could conclude that Officer Parker arrested Patel.

> There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required. The difference is one of extent, with the line of demarcation resulting from the weighing of a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Dunaway v. New York*, 442 U.S. 200, 209, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979); *see also United States v. Puglisi*, 723 F.2d 779, 785 (11th Cir.[ ]1984).

*U.S. v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004). The Eleventh Circuit has given several factors to consider in making this determination:

> These factors are: " 'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.' " *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir.[ ]2000) (quoting *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir.[ ]1988)); *see also Sharpe*, 470 U.S. at 685–86, 105 S.Ct. at 1575.

*Id.* at 1146.

Patel argues that this was obviously an arrest. (*See* Doc. 115 at 69) ("As they say, if it looks like a duck and quacks like a duck, it is probably a duck."). However, his briefing is more equivocal and, ultimately, unpersuasive. Patel's brief states that

"Parker admitted to the City's training supervisor that the only reason he did not arrest Patel was because his supervisor . . . told him not to do so." (*Id.*). He might have told his supervisor he did not arrest Patel for any numbers of reasons but, either way, for what it is worth, Officer Parker stated he did not arrest Patel. (*See id.*). This evidence does not advance Patel's false-arrest claim. Patel then falls back on arguing that this was a *de facto* arrest. (*See id.* at 69-72) ("Parker's actions transformed the unlawful investigatory detention into an unlawful *de facto* arrest."). Basically, Patel argues that "Parker indisputably used clearly excessive force and thereby transformed the detention into an arrest requiring probable cause." (*Id.* at 71). Patel relies upon a case from the First Circuit. (*Id.*) (citing *Morelli v. Webster*, 552 F.3d 12, 21 (1st Cir. 2009). In *Morelli*, the court found that "a reasonable jury could find a [*de facto*] arrest" because of "the aggressive physical touching, the relatively lengthy immobilization, the removal of the plaintiff from a public hallway to a private room, the command not to leave, and the ensuing interrogation in a small room populated by multiple police officers." *See Morelli*, 552 F.3d at 21.

In the current case, there was "aggressive physical touching" followed by Patel being severely injured and handcuffed, but Patel was not moved to a private area and interrogated in the same fashion as the plaintiff in *Morelli*. In other words, this case looks more like a *Terry* stop gone awry than a formal arrest. In this case, the fact that

58

Patel did not leave the scene after the takedown was because of his injuries, not an arrest. The fact that Officer Parker put handcuffs on Patel does not change the analysis because that, by itself, is not enough. *See Acosta*, 363 F.3d at 1147. Patel simply has not proffered enough evidence that, under relevant case law, could convince a reasonable jury that Officer Parker arrested him via the leg sweep and handcuffing.

Officer Parker cites to the four factors, enumerated in *Acosta*, and argues that the *Terry* stop did not lead to an arrest. (*See* Doc. 127 at 22-25). The City relies on a case from the Tenth Circuit. (*See* Doc. 128 at 30) (citing *Gallegos v. City of Colorado Springs*, 114 F.3d 1024 (10th Cir. 1997)). In that case, the police officer used an "arm bar maneuver" when his police trainee could not "control a man who weighed 200 pounds or more." *See Gallegos*, 114 F.3d at 1031. The court determined that "Sergeant Lofgren harbored an objectively reasonable belief there was a serious risk [the suspect] would strike Officer Santos with his free arm." *See id.* However, "[o]nly seconds after Sergeant Lofgren initiated the take-down procedure, [the suspect] and Officer Santos unfortunately were struck by the hit-and-run driver." *See id.* For that reason, that case is of limited utility here, as its analysis of the post-takedown actions of the parties is limited.

Both defendants argue that Officer Parker did not arrest Patel. (*See* Doc. 127

at 22) ("[I]t is clear that [Patel] was the subject only of an investigatory stop."); (Doc. 128 at 28-30) ("[T]he takedown was justified and did not "transform" [Patel's] detention into an arrest for Fourth Amendment purposes.").[41] The Court agrees, for the reasons previously explained. To the extent that Patel has attempted to raise an unlawful arrest claim, the Court **GRANTS** summary judgment to the Defendants.

## V.   CONCLUSION

This is a difficult case. It involves determinations that are undoubtedly disappointing to all parties at one point or another. It also involves multiple material, factual determinations; determinations that a jury of concerned citizens will aptly be able to handle. The Court respects the unique needs and challenges that face police officers every day on the job. The Court also understands that the Fourth Amendment stands to protect people from unreasonable government action. The opinion the Court issues today strikes a careful balance.

In conclusion, the Court rules as follows:

---

[41]   However, taking such a position puts the defendants in an interesting position. One of the reasons that Patel argues he was arrested was because Officer Parker "emptied his pockets." (See Doc. 115 at 72). The Court notes this is best shown on the Spence Dashcam Video. (See Spence Dashcam Video at 01:00 to 01:20). Ultimately, this search is not enough to convince the Court that Patel was arrested, but it does clearly show that Patel was searched. Patel calls this a "classic search incident to arrest." (See Doc. 115 at 49). This makes sense because  a *Terry* frisk is a patdown for weapons. *See U.S. v. Clay*, 483 F.3d 739, 744-45 (11th Cir. 2007). "[A] Terry search may continue when an officer feels a concealed object that he reasonably believes may be a weapon." *Id.* at 744. Here, Officer Parker went beyond a patdown. He reached into Patel's pockets.

- The footnote asking the Court to strike Patel's response is **DENIED**.

- The Court **GRANTS** Officer Parker **QUALIFIED IMMUNITY** on the *Terry* stop and frisk claims. However, Officer Parker's Motion for Summary Judgment on Count III is **DENIED**.

- Officer Parker's Motion for Summary Judgment on state law search and seizure is **GRANTED** on state agent immunity grounds. His Motion for Summary Judgment on state law assault and battery is **DENIED**.

- The City of Madison's Motion for Judgment on the Pleadings is **DENIED**.

- The City's Motion for Summary Judgment is **DENIED**.

- Patel's Motion for Summary Judgment is **DENIED**.

- Summary judgment in favor of the defendants is **GRANTED** on the false arrest theory.

The claims remaining are as follows:

- Count III excessive force and Count VI state law assault and battery against Officer Parker.

- Counts I, II, and III against the City of Madison.

The parties are hereby **ORDERED** to submit within 30 days from today a proposed scheduling order for the *Monell*-related part of the litigation.

**DONE** and **ORDERED** this the 19th day of April, 2018.

VIRGINIA EMERSON HOPKINS
United States District Judge